THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ERIC BEARD *et al.*, Defendants-Appellants.

Second District (2nd Division) No. 74-402

Opinion filed February 10, 1976.

Ralph Ruebner and Peter B. Nolte, both of State Appellate Defender's Office, of Elgin, for appellants.

Philip G. Reinhard, State's Attorney, of Rockford (Edward N. Morris and Martin P. Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendants were indicted for burglary and for theft of property in excess of $150 and were tried by a jury. A mistrial was declared on the burglary charge and the defendants were convicted of theft and were sentenced to not less than 2 nor more than 6 years in the penitentiary.

In this appeal both defendants contend the court erred in denying a motion to suppress evidence seized by the police from Leavy's automobile because the seizure was pursuant to an illegal arrest. Defendant Leavy also contends that the court erred in denying his motion to sever his trial from that of defendant Beard.

It is necessary to relate the sequence of events which occurred on the morning of June 1, 1973, in order to consider the question raised as to the validity of the detention and arrest of the defendants.

At 8 a.m., June 1, 1973, one Mr. Green left his residence to go to work. At approximately 9:30 that same morning, Officer Harmon of the Rockford Police Force while driving his unmarked patrol car, received a police radio broadcast to the effect that two black men had attempted to trade some silver coins for currency at a liquor store and the order from headquarters which put out the broadcast was to watch for the automobile which was a black-over-red Cadillac with a given license number. At around 11 a.m., Mr. Green was informed by a neighbor that his house had been burglarized. At approximately the same time Officer Harmon received a second police broadcast (he referred to it as a "1068" order) to the effect that the previously described Cadillac had appeared at a different location and the occupants had again tried to trade some silver coins for currency. He testified in response to the

question whether he had received a direct order to stop the Cadillac from police headquarters:

> "Well I would say that when they put a message out, a Ten-Sixty-Eight, to be on the lookout, this means, yes, if you see the car, stop it, and investigate, so yes, I had a direct order."

At approximately 11 a.m. Officer Harriott, also of the Rockford Police Department, was assigned to investigate a burglary at the Green home. He arrived there shortly afterward and learned that a considerable quantity of silver coins had been taken in the burglary. At about 11:45, having completed his initial investigation, Officer Harriott telephoned the radio officer at police headquarters and informed him that there might be a connection between the Green burglary and the attempt to cash in the silver coins by the occupants of the Cadillac. Officer Harriott had received the same original message Officer Harmon had received about the Cadillac. Officer Harriott testified that he suggested to the radio officer that the search for the Cadillac be intensified under the circumstances.

About 12:50 Officer Harmon saw the Cadillac parked near a coin shop. He radioed to headquarters for assistance and said he was going to follow the Cadillac. As soon as the Cadillac began moving again Officer Harmon followed it and in a few minutes a marked squad car fell in behind the Cadillac and stopped it. This occurred at approximately 1:05 p.m.

Officer Schoeneweiss, who was driving the squad car which stopped the Cadillac, testified he did so because he had received a radio call from headquarters that Officer Harmon was following a black-over-red Cadillac and had asked for assistance. He testified that he had heard the previous "1068" order but had not heard anything about a burglary before he stopped the Cadillac. The radio request for assistance came from police headquarters, not from Harmon, and the radio message received about 1:10 p.m. was not the first message he had received about a black-over-red Cadillac.

When Officer Schoeneweiss had stopped the Cadillac he approached the driver's side and asked who owned the car, receiving an answer from Eric Beard that he owned it. Officer Schoeneweiss then asked for his driver's license and noticed when it was produced that the driver's license was not signed and therefore was not valid. While Schoeneweiss was giving Beard a citation for an invalid driver's license, Officer Harmon came up behind and asked Beard if he could look in the car. The officer testified he received an affirmative reply from Beard. Then he looked in the car and said he could see a great deal of half dollars. He also testified he could see a substance he believed to be cannabis on

the front seat. He searched Beard and found more of the same substance on Beard's person. He then returned to the car and looked under the front seat, where he noticed "a quantity of half dollars loose in rolls underneath the passenger side" of the car. Both defendants were arrested at that time and taken to the police station where an inventory search was conducted. The coins and a watch the defendant Beard was wearing were later identified as being the property of Mr. Green.

We first consider the question raised by both defendants as to the legality of their arrest. It is the theory of the defense that there was no probable cause to stop the Cadillac, hence the arrest which followed the stop and detention was tainted and the fruits of such arrest—that is, the evidence found in the car by the arresting officer—cannot be used in the trial. Defendants cite the case of *People v. Catavdella*, 31 Ill. 2d 382, in support of this contention. In *Catavdella* the defendants were stopped on the street without a warrant for their arrest or a search warrant. The officers noted some antique pistols and a camera case lying on the back seat of the car after the arrest. The car was taken to the police station where the trunk was forced open, revealing four other guns and a television set. While the officers testified at the trial that they had occasion to arrest the occupants of the car because they had observed the car weaving in traffic and that it made an improper left turn and that the license plate was obscured, this testimony was more or less impeached, so that it came down to a question of lack of probable cause. Our Supreme Court reversed the conviction saying:

> "Arrest without a warrant is valid if a criminal offense has been committed and the arresting officer has reasonable grounds to believe that the person arrested committed the crime, or if a criminal offense is committed in the presence of the officer. The arrest here cannot be sustained upon the first ground, for it is admitted that the officers had no knowledge that a burglary had been committed, nor had any reason to suspect that the defendants had committed the crime of burglary at the time of the arrest. If the arrest and search can be sustained it must be on the ground that a criminal offense was committed in the presence of the arresting officers. The testimony of officer Nicolini casts grave doubt upon the validity of the arrest. At the preliminary hearing he testified that he had not observed the defendants violate any law prior to the time they were placed under arrest, while at the trial he testified that he had observed the defendants violating several traffic ordinances." 31 Ill. 2d 382, 387-388.

■■ It should be observed that in *Catavdella* the State's case was weakened by the impeachment of the arresting officers' testimony as to

their observation of a traffic offense. Since they had testified the traffic violation was the immediate cause of the arrest and they had no knowledge of a specific burglary, the impeachment of the testimony regarding the traffic violation left the police with no basis of probable cause for the arrest. In the present case the message to the officers to stop and investigate was justified by the knowledge possessed by police headquarters prior to the arrest regarding the theft of silver coins. The decision of this court in *People v. Harr*, 93 Ill. App. 2d 146, is also invoked by the defendants. That case we do not find apposite to the present situation. There the stop was based on section 6—118 of the Illinois Motor Vehicle Law (Ill. Rev. Stat. 1965, ch. 95½, par. 6—118) requiring the driver's license to be carried and exhibited on demand. In *Harr* this court said:

> "The facts in this case indicate that the police officer here did not stop the defendant's car for the purpose of enforcing this statute. He stopped it, on the admitted facts, for the purpose of finding out who the defendant was, where he had been and where he was going. The statute cannot, in any event, be made applicable as authority to inspect the license as a mere subterfuge to obtain information or evidence not related to the licensing requirement." (93 Ill. App. 2d 146, 149-150.)

In the case before us there were definitely suspicious circumstances known collectively to the police and the request to see the defendant's driver's license was merely incidental to the stop and not the pretext for it. The *Harr* case is therefore not controlling here.

The State relies on *People v. Lee*, 48 Ill. 2d 272, where the defendants were stopped while walking along the street, purely on suspicion and a subsequent search of their persons revealed some firearms' ammunition, this being the basis of their conviction for unlawful possession of firearms' ammunition. The police had been alerted that a "gang war" was about to break out that evening. They subsequently heard some loud reports which might have been gunfire. Shortly afterward they observed the defendants and three other young men walking together and wearing an insignia which belonged to a particular gang. The police stopped the group and subjected each of them to a "pat" search, which revealed the unlawful ammunition carried by the defendants. Our Supreme Court in upholding the legality of the stop and search referred to the United States Supreme Court case of *Terry v. Ohio*, 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911, 88 S. Ct. 1868, where the court sanctioned the legality of a "limited search" by a police officer, "in an attempt to discover weapons which might be used to assault him." However, as was carefully pointed out in *Terry*, this holding was based on suspicious behavior of the de-

fendant which would reasonably lead a police officer to suspect criminal activity was imminent and was limited to a "limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry* was thus concerned rather with a search for weapons than with seizure of evidence, however, in *Lee* our Supreme Court upheld both the initial stop on the basis of suspicious circumstances indicating the possibility of gang violence and the subsequent search on the basis of concern for the officers safety. Since the possibility of nearby gang warfare might justify the officers both in stopping the defendants as being possible participants in such violence and in the subsequent search for weapons on the grounds of safety precautions, there appears to be a rational basis for the holding in *Lee* in the combination of these two elements. That is, suspicious circumstances and reasonable concern for personal safety. It is contended by the defendants, however, that the present case goes a step beyond the *Terry* and *Lee* cases in that here there were no circumstances known to the arresting officer which would justify the initial stop. The defendants argue that the only circumstance known to the arresting officer, Schoeneweiss, was that another officer, Harmon, had the car under surveillance and wanted assistance in stopping it. This, the defendants say, is not sufficient to establish probable cause for the arrest, even under *Terry* and *Lee* and certainly is contrary to *Catavdella.*

Two recent appellate court cases have dealt with the question of probable cause to arrest under circumstances similar to those present here. In *People v. Harper*, 16 Ill. App. 3d 252, following an investigation into an aggravated battery, the police headquarters issued a "stop order" for the two defendants. This was described by several police officers as being in essence a directive for any police officer to arrest the person named therein. This is much the same as the interpretation of the "1068" order received by Officers Harmon and Schoeneweiss by radiogram concerning the occupants of the Cadillac in the case before us. As a consequence of the "stop order" and an anonymous phone tip to the police, the defendants in the *Harper* case were arrested and subsequently charged with murder. They contended their arrest was illegal as the stop order plus an anonymous telephone call were not sufficient to establish probable cause for an arrest without a warrant. In dealing with this contention the appellate court said:

> "A police officer may arrest a person without a warrant as long as he has reasonable grounds to believe the person is committing or has committed an offense [citation]. The quantum of proof needed to establish probable cause is less than that required to sustain a conviction at trial. [Citation.] The test of

probable cause is whether a reasonable and prudent man in possession of the knowledge which has come to the arresting officer's attention would believe the person to be arrested is guilty of the crime. [Citation.]

"In light of the above criteria, we believe that the stop order issued by police concerning the aggravated battery to Velma Glenn provided a sufficient basis for establishing probable cause for the arrest of Harper." 16 Ill. App. 3d 252, 257.

Likewise, in *People v. Butler*, 12 Ill. App. 3d 541, 545, the court in upholding a warrantless search of an automobile said:

"Defendant stresses that the dispatching officer knew no more than he had heard from an unidentified caller. Of course, this is true—but such fact, does not argue against his relaying such information over the police network and the searching officers relying on same—simply because he didn't know whether the facts related to him were true or not."

In *People v. Jones*, 31 Ill. 2d 42, 47, our Supreme Court, in affirming this reasoning, stated:

"It is certain that mere suspicion, common rumor or report do not afford probable cause for arrest, [citations] yet, at the same time, reasonable cause means something less than evidence which would result in a conviction, and it is also established that reasonable cause may be founded upon evidence that would not be admissible at the trial."

In *People v. Davis*, 21 Ill. App. 3d 177, 179, following an armed robbery in a tavern and on the basis of a description given by a tavern patron, a flash message was sent out by police headquarters to all police units in the area giving a description of the robbers and that they were "'riding in a 1961, possibly a 1961 to 1964 Ford station wagon white in color.'" Two officers riding in a squad car observing a white Ford station wagon with three occupants, curbed the station wagon and searched the occupants, discovering weapons as well as property taken in the recent robbery. The defendants contended the flash message was too general to establish probable cause to arrest them and that the arresting officer did not have reasonable cause to connect them with any particular crime. However, the appellate court said:

"Given the immediacy of the flash message, the matching descriptions of the vehicle and its occupants, and the proximity in time and place to the robbery, the circumstances of this case clearly demonstrate that the officers obviously had probable cause to arrest." 21 Ill. App. 3d 177, 181.

At the time of the arrest in the case before us, therefore, we had

the following situation. All officers had been alerted to watch for and stop the Cadillac because of the suspicious circumstances that two occupants had tried to cash a considerable quantity of silver coins in at a liquor store and at a currency exchange; Officer Harriott had telephoned police headquarters that a large quantity of silver coins had been stolen in the Green burglary that morning and that there was a possible connection between that crime and the men driving the Cadillac and attempting to cash in the silver coins.

Under all these circumstances, while we recognize that the arresting officers did not actually know a crime had been committed having to do with silver coins, the investigating officer knew it and had communicated his findings to police headquarters. Subsequent to receiving that information police headquarters had confirmed the previous stop order by directing Officer Schoeneweiss in his squad car to assist Officer Harmon who was following the Cadillac. Officer Schoeneweiss had received the previous "1068" order which was broadcast to all squad cars so he was aware that the occupants were under suspicion. Adding all this together we are inclined to agree with the remarks of the trial judge, who in denying the motion to suppress evidence on the ground of illegal arrest, said:

> "I do not believe that every officer on the Police Department has to have an entire 100% picture before him. In this situation there had been a radio communication put out by Police Headquarters and to each officer that was on the stand they couldn't testify to the exact radio message. It was obvious that the messages that were there and that's why they ended up chasing the car and stopping the car. It is not unreasonable to stop that car when they were just trying to cash in Four Hundred Dollars in half dollars and other coins and then to look into the car."

■■  Whatever may have been the abstract legal situation with respect to probable cause for arrest at the time of the original "1068" order from police headquarters, there was certainly probable cause for arrest of the defendants after Officer Harriott had advised headquarters of his findings with regard to the theft of the silver coins. The fact that Officer Harmon did not have all of Officer Harriott's knowledge is not fatal to the arrest in view of the fact that police headquarters had received Officer Harriott's information and following the earlier radiograms to stop and investigate had confirmed these by ordering Officer Schoeneweiss's squad car to assist Officer Harmon who had just sighted the wanted car and was following it. Our Supreme Court said in *People v. Peak*, 29 Ill. 2d 343, 349, where an officer not having knowledge

sufficient for an arrest, arrested the defendant on orders from another officer who did have the necessary information:

> "When the officers are working together under such circumstances the knowledge of each is the knowledge of all and the arresting officer had the right to rely on the knowledge of the officer giving the command together with his own personal knowledge."

See also *People v. Taylor*, 6 Ill. App. 3d 343, to the same effect.

Since ample grounds for the arrest of the defendants were known at police headquarters, confirming the original "1068" order to stop and investigate, we hold that the stopping and questioning of the defendants by the arresting officers was not without probable cause and the subsequent search and arrest were proper.

We consider now the contention of the defendant, Leavy, that it was error for the court to deny his motion for a severance of his trial from that of defendant, Beard. This is based on a claimed antagonism in defense theories as between Beard and Leavy. Leavy does not deny being with Beard when Beard attempted to dispose of the silver coins in question but says that he had no knowledge that the coins had been stolen, thinking that they belonged to Beard or members of Beard's family and that he, Leavy, went with Beard to sell some coins of his own at the same time. On the other hand, Leavy points out that Beard's defense is based on an alibi, the alibi was that Beard and his brother had gone to Rochelle, Illinois, at about 7:30 in the morning of June 1 to seek employment at the Swift Packing plant in Rochelle and had not returned until around 11 that day, at which time the burglary had already occurred. (The coins had actually been offered for sale earlier than 11 o'clock that morning.) Leavy contends that he cannot establish his innocence without telling his own story on the stand and since this would put him in company with Beard at a time when Beard professes to have been elsewhere, there is an inconsistency which makes Beard's defense antagonistic to that of Leavy, thus requiring a severance.

As was said in *People v. Lindsay*, 412 Ill. 472, 481:

> "Where defenses are antagonistic and one defendant accuses the other, thus making it impossible for the defendant asking for a severance to have a fair trial, the severance should be granted."

However, that case makes it clear that the antagonism or inconsistency must be such as to indicate that the defendant seeking it could not receive a fair trial if tried with the other defendant. This court, in *People v. Watkins*, 3 Ill. App. 3d 560, upheld the denial of a motion for severance on the ground that there was not the required degree of antagonism which would necessarily deprive the defendant of a

trial. See also *People v. Rahn*, 15 Ill. App. 3d 170, where the antagonism was based on anticipated confessions of the other defendants, but in fact the defendant seeking the severance gave testimony which was not inconsistent with the actual testimony of his fellow defendants and the appellate court upheld the trial court's discretion in denying the severance since the particular facts were not such as to deny the defendant a fair trial if the defendants were tried jointly.

In the case before us Leavy admitted participating in selling the coins but asserted he did not steal them or know they were stolen, hence his defense depended entirely on his credibility as an innocent associate. In order to establish prejudice by the denial of the motion for severance it was necessary for Leavy to establish an inconsistency between his testimony and that of his codefendant which would necessarily have reflected on Leavy's credibility. But, such inconsistency would not be established unless Leavy took the stand and personally recounted his state of mind at the time the coins were offered for sale— that is, that he supposed the coins actually belonged to Beard since he, Leavy, did not participate in and was not aware of the burglary.

The colloquy between defense counsel and the court at the time defense counsel again moved for severance, just before the commencement of the trial, indicates very clearly that the court was not making a final ruling when he denied the instant motion for a severance but the court merely was not convinced that Leavy would necessarily suffer prejudice if tried together with Beard. The court said:

> "I am going to deny the motion at this time. I would state to you categorically if it appears later there is, shall I say a conflict, I may grant you a new trial if he is convicted. I think that is grounds for a new trial unless you want a severance now."

■■ To which defense counsel answered: "No, your Honor," thus, we assume, indicating his agreement with the court's thinking that severance need not be granted unless and until there was a conflict established by the testimony of the two codefendants. The defendant contends he was prevented from testifying because of the pressure put on him by the State's announced intention to present his prior conviction for burglary to the jury by way of impeachment if Leavy took the stand in his own behalf. However, we think it was a legitimate tactic on the State's part to thus impeach the defendant's credibility and it was then up to the defendant to weigh the advantage of severance—if he so considered it —against the disadvantage of revealing his past conviction. He apparently decided the severance was not worth what it might cost him by way of prejudice in the eyes of the jury as he did not take the stand.

His decision not to testify in his own behalf precluded the possibility

of a conflict between his testimony and that of his codefendant, therefore the possible conflict alluded to by the trial judge never developed and there was no occasion for the judge to rule again on the question of prejudice to Leavy's case by not having been severed.

■■ We cannot now speculate as to what the result might have been if his case had been severed and he had testified in his own behalf. This did not occur and no prejudice to Leavy was established. The possibility of prejudice to Leavy by denial of the severance therefore becomes too speculative to require serious consideration as a ground for a new trial. The antagonism was neither direct nor inevitable and the trial court was within its proper discretion in denying the motion until such time as actual prejudice might be shown.

We find no error in the record and the judgment of the trial court is affirmed.

Judgment affirmed.

T. J. MORAN, P. J., and DIXON, J., concur.