THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN CREACH *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 76-834, 76-835 cons.

Opinion filed February 15, 1979.

LINN, J., dissenting.

Patrick ·G. Reardon, of Chicago (Edward Burke Arnolds, of counsel), for appellant Thomas Ruppert.

Edward M. Genson, of Chicago, for appellant John Creach.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Renee Goldfarb, and Richard Heytow, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

John Creach and Thomas Ruppert, the defendants, were charged with the murder and armed robbery of Delores Irion. Following their joint trial before a jury, defendant Creach was found guilty of murder and armed robbery and defendant Ruppert was found guilty of armed robbery. Creach was sentenced to 35 to 70 years on each charge, to run concurrently, and Ruppert was sentenced to 4 to 12 years for armed robbery. On appeal the following issues are raised: (1) both defendants contend they were arrested illegally and without probable cause; (2) both defendants contend statements they made should have been suppressed because they were not fully warned of their rights; (3) defendant Ruppert advances two additional reasons for suppression of his statements: (a) the police made no attempt to notify his parents of his arrest, and (b) he did not knowingly and intelligently waive his rights; (4) both defendants contend the trial court erred in failing to suppress evidence obtained as a result of what they assert were illegal arrests; (5) defendant Creach contends the trial court also erred by allowing into evidence statements made by defendant Ruppert which implicated Creach where Ruppert did not testify and thus was not available to Creach for cross-examination; (6) both defendants assert that their guilt was not established beyond a reasonable doubt, although on two distinct grounds: (a) Creach argues his sanity was not proven, and (b) Ruppert argues that his accountability for the acts of Creach was not proven; (7) finally, defendant Ruppert contends the trial court erred in refusing to give his tendered instructions on compulsion, accountability, and accessories after the fact.

We reverse and remand for a new trial.

The body of Delores Irion was found lying near the CTA tracks in Evanston at about 7 a.m. on September 25, 1973. Detective Carlos Mitchem of the Evanston Police Department spoke that day to Dolly Moore, defendant Creach's mother, who lived at 5717 North Magnolia Street in Chicago. She told Mitchem that her son had been living with the victim in the victim's apartment for the last four weeks. During that time he had driven the victim's car, and had been driving the victim to and from work. Mrs. Moore had spoken to her son in Ohio by telephone. He told her that he was there with a friend named Tom, and that he had last seen Irion alive when he left for Ohio in her 1966 Cadillac. The police investigation had already revealed that the automobile was missing. Detective Mitchem related this conversation to Detective Douglas Glanz

of the Evanston Police Department on the evening of September 25. The next morning at about 8 a.m. Glanz and his partner, Detective John Birkenheier, went to Creach's residence. They spoke to Mrs. Moore, who related what she had told Detective Mitchem, also stating that she had told Creach to come home and he said he would do so right away. The officers told Mrs. Moore that when the defendants returned, they intended to take them to the Evanston police station for questioning. Mrs. Moore asked if she could accompany them and they agreed to let her do so. Mrs. Moore showed them a photograph of Creach. Earlier Detective Mitchem had described Ruppert to Glanz as a short youth with fair hair.

At about 9:30 a.m. on September 26 the officers observed Creach and Ruppert approaching Creach's home on foot. The officers got out of their unmarked squad car, approached the defendants, identified themselves as police officers, and told them they were going to return them to Evanston for questioning. They also frisked the defendants for weapons. Defendants were ultimately transported to the Evanston station and questioned. The statements obtained from them constituted the major evidence used against them at trial.

### 1.

The State contends that defendants were not arrested at the time of their encounter with the police at the Magnolia Street location. By statute in Illinois "[a]n arrest is made by an actual restraint of the person or by his submission to custody." (Ill. Rev. Stat. 1975, ch. 38, par. 107—5(a).) Because the existence of restraint or of a custodial situation is not always unambiguously clear, the courts of this State have found it necessary to elaborate some of the elements of an arrest. A common listing of elements includes: (1) authority to arrest; (2) assertion of that authority with intention to effect an arrest; and (3) restraint of the person to be arrested. (*People v. Mirbelle* (1934), 276 Ill. App. 533; *People v. Howlett* (1971), 1 Ill. App. 3d 906, 274 N.E.2d 885; *People v. Robbins* (1977), 54 Ill. App. 3d 298, 369 N.E.2d 577.) Our supreme court has recently focussed on two elements involving the perceptions of the parties in determining whether a police encounter constituted an arrest: the intent of the officer and whether a reasonable *innocent* man in the defendant's situation would have considered himself under arrest. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) In *Wipfler* the defendant's mother relayed a police request to talk to him about some burglaries. Defendant went to the police station after school. He was asked to come into a sergeant's office where, with the door closed, he was questioned by two police officers. The supreme court, applying the second of the two tests set out above, found that defendant went to the police station voluntarily, knowing that the police had wanted to reach him and knew where he was but

had not attempted to take him into custody. At the station he was not searched, booked or fingerprinted. Under these circumstances the court concluded: "A reasonable, innocent man * * * would have been cognizant that this did not amount to arrest, *in light of the total lack of compulsion by the police either in obtaining or retaining his presence at the station.*" (Emphasis added.) (68 Ill. 2d 158, 167, 368 N.E.2d 870, 873.) The court stated that because of their determination of this factor the intent of the police did not have to be established. The court did, however, note that "the manner in which defendant's presence was obtained, and the information the police had about defendant prior to interrogation, lends [sic] credence to the testimony of [the officer] that defendant was not, in [the officer's] mind, under arrest at the time and that *he could have left without police permission* because there was 'nothing to hold him for.' " (Emphasis added.) 68 Ill. 2d 158, 167, 368 N.E.2d 870, 873.

■■ It is clear from this summary that the relevant perceptions of the police pertain to whether coercion exists and whether defendant is in custody or is free to leave. This focus comports with the statutory definition of an arrest we have cited. In this cause the testimony of the arresting officers was they did not intend to "arrest" the defendants, but did intend to take them into custody for questioning. They also testified that defendants would not have been free to leave. It is evident the distinction made by the officers was not a legal one: their intention to take the defendants into custody constituted the essence of an arrest. Therefore the testimony of these officers establishes their intent to arrest the defendants within the meaning of the term as construed by Illinois courts. The second facet of this test, the perception of an innocent man in the defendant's position, also establishes that there was an arrest. Defendants were approached by two officers, informed that they were to be transported to the police station for questioning, and then were searched for weapons. They were then transported in a police car to the police station and separately questioned. This is not analogous to the situation in *Wipfler* where a defendant received a police request to come to the station for questioning and voluntarily acquiesced on his own. Defendants were given no choice in the matter. Under these circumstances we conclude defendants were arrested when the police took them into custody on Magnolia Street.

Because we have determined that defendants were arrested at this initial police encounter, the issue becomes whether the officers had probable cause to make these arrests. The arresting officers, Douglas Glanz and John Birkenheier, testified at the motion to suppress hearing. Our review of that testimony indicates that the officers had the following information at the time of the arrests: Delores Irion was found dead at

about 7 a.m. in Evanston on September 25, 1973. It had rained the night before but the victim's clothes were dry, suggesting she had been killed some time after midnight. The victim's automobile, a 1966 Cadillac, was missing. Defendant Creach was the victim's boyfriend and had been living off and on with her for four weeks. He had been driving her car, taking her to work on occasion. Creach's mother had talked to him by telephone in Ohio. He told her he had the victim's 1966 Cadillac and had last seen her alive at about 1:30 on the morning of September 25, when he had left for Ohio in her car. He was in Ohio with a friend named Tom. When Creach was informed by his mother of Delores Irion's death he told her he would drive back to Chicago right away. The officers were shown a picture of Creach by his mother, but the only description they had of Tom was that he was a short youth with fair hair.

■ This information was manifestly insufficient to establish probable cause. The officers knew that defendant Creach had seen the victim at about 1:30 a.m. on the night she was killed and subsequently had driven to Ohio in her car, but they also knew he was her boyfriend, had been living with her, and had been driving her car in the past. They also knew that when informed of the murder he voluntarily returned to Illinois. At most the police had reason to question Creach concerning his activities, but mere suspicion is insufficient to establish probable cause. (*People v. Jones* (1959), 16 Ill. 2d 569, 158 N.E.2d 773; *In re Brewer* (1974), 24 Ill. App. 3d 330, 320 N.E.2d 340.) And the police knew much less concerning defendant Ruppert. They knew only that he had been in Ohio with Creach. Certainly this information would not warrant a man of reasonable caution in the belief that the defendants had robbed and murdered Delores Irion. *Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302; *People v. Riszowski* (1974), 22 Ill. App. 3d 741, 318 N.E.2d 10.

At the motion to suppress hearing the trial judge initially concluded that there was probable cause to arrest the defendants. However defendants then filed a motion to reconsider and in denying this motion the judge indicated his belief that the police acted properly *despite a lack of probable cause*:

> "At this point *there is a serious question as to whether or not there was probable cause for arrest*. There is, however, no question that the persons last seeing the victim alive were the two defendants.

> There is also argument, and *reasonable men can differ as to whether or not there was what I might refer to as a chargeable arrest. And by that I mean whether or not were ready to charge either or both defendants with the crime of murder at that point.*

> There is in the law a provision as cited by defense, and although I

believe it does not go as far as the facts in this case went, whereby a fellow citizen may be removed from whatever location to the police station for the purpose of making inquiry about the facts and circumstances of any crime that was in fact, that the police knew in fact to have been committed. In this case there was no question that a crime had in fact been committed. The victim's body had been recovered, and the police had already made an examination of the scene where the body was located.

Therefore, in summation on the question of the right of the Evanston police to detain or take into custody or arrest, as you will, the defendants in this case I believe that they have the authority under those exigent circumstances to do that which they did.

There is further argument or may be further argument although the boys were patted down prior to their being taken by police vehicle to first the scene where they suggested the vehicle had been left, and then on to Evanston to the Evanston Police Department. Whether that constituted an arrest is debatable. Some may argue that they were merely asking, requesting the defendants to proceed with them for the purpose of further interrogation since they were the last persons to see the victim alive. They also had possession of a substantial item of property belonging to that victim.

Be that as it may, however, I have found that there is in my judgment an in custody deliverance of both defendants from the homse [*sic*] at 5717 North Magnolia to the Evanston Police Department.

It seems to me that what the Courts are trying to do, and as usual the facts don't fit into prior cases, each case being and rightly so considered separate and apart on its own factual situation, that under these circumstances the police officer acted as we would have them act. *It was not certain that either or both of the boys were involved in the homicide of the victim at that point.* It was known that they were the last parties to have seen the victim alive, that they did have an item of her property, and that they had proceeded out of state at approximately the same time that the police believed that the victim's life had been taken.

I believe what they did was they were investigating the commission of a crime, that they did have the power to seek the fruits of the crime, and as here I believe that their actions and conduct were open and sincere. If we are to find a better alternative I could not suggest it. *I don't believe that there was*

*appropriate evidence for—appropriate evidence for a warrant to issue because it still was not clear that these boys were in any way related to the crime.* They did have items in their possession which may very well lead the police to the determination of someone who may have been involved in the crime. So they may be very serious suspects and at the same time material witnesses.

In my judgment I am concluding that the police officers acted reasonably and that because of the exigent circumstances they had the right, that the City of Evanston police did have the right to act as they did within the city limits of Chicago which is in fact an adjacent municipality, and therefore part of the same police district." (Emphasis added.)

Of course we have determined that defendants were arrested at this point, and the absence of probable cause renders those arrests illegal.

The State asserts on appeal that other information, adduced at trial as having been obtained by other members of the Evanston police department, was within the knowledge of the Officers Glanz and Birkenheier at the time they arrested the defendants and provided them with probable cause. That additional information was that the victim had been shot with a .25-caliber automatic pistol, a box for a .25-caliber pistol was found in the victim's apartment, and the apartment had been locked with a key when the police reached it. We do not find that this evidence, even when coupled with the knowledge of Officers Glanz and Birkenheier that defendant Creach had lived with the victim, provided them with probable cause. There was, of course, no indication that the victim's pistol, if she in fact owned one, was the weapon used to kill her. Nor was there any reason to suspect that the gun had been taken from the apartment by anyone other than the victim. Furthermore, the ordinary presumption that for purposes of probable cause the knowledge of one officer is imputed to the others involved in the cause (*People v. Peak* (1963), 29 Ill. 2d 343, 194 N.E.2d 322), does not apply here, for at the motion to suppress hearing Officer Glanz was specifically asked whether the knowledge he had described at that hearing was all the information on the case that he possessed concerning the involvement of defendant Creach, and he stated that it was. And the only testimony concerning communication with other officers about the case prior to the arrests was that of Glanz, who had spoken to Detective Mitchem and received from him some of the information he related at the hearing. There was no evidence that the additional information cited by the State was communicated to the officers.

Because we have determined that the arrests of the defendants were illegal for lack of probable cause, we need not determine the defendants'

contention that the Evanston police lacked authority to arrest them in Chicago.

When a defendant has been arrested without probable cause, statements by the defendant and other evidence obtained as a result of that arrest are inadmissible at trial unless the State can establish the existence of intervening circumstances which dissipated the taint of the illegal arrest. (*People v. Williams* (1977), 53 Ill. App. 3d 266, 368 N.E.2d 679; *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) Defendants assert that their statements and other evidence used against them at trial should have been suppressed on this ground and, as independent bases, because of alleged violations of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and, as to defendant Ruppert, because he did not intelligently and voluntarily waive his rights. In order to properly evaluate these claims it is necessary to review the sequence of events following the arrest of the defendants.

Defendants were arrested at about 9:45 a.m. Earlier, when the police had spoken to Mrs. Moore and informed her of their intention to take defendants into custody, she asked to accompany them, and the police agreed. Accordingly she got into the police car with the defendants and the two officers. In the car Mrs. Moore asked defendant Creach where the car was, and he said it was at Broadway and Belmont. Officer Glanz asked what the best way to get there was and Ruppert gave directions. When they reached that location and found the Cadillac there, Officer Birkenheier asked who had the keys to the car and Creach handed them to him. Defendants were then transported to the Evanston police station, arriving there at about 11:30 a.m. Creach was taken into one "interview room" with Officer Glanz, and Ruppert was taken into another with Officer Birkenheier. It was at this point that the defendants were advised for the first time of their *Miranda* rights. Officer Glanz testified that he fully advised Creach of his rights and that Creach stated he understood them. Officer Birkenheier, utilizing a form, informed Ruppert of all his rights under *Miranda*, except that in advising him of his right to an attorney he failed to specifically advise him that he had a right to the presence of an attorney *during questioning*. Ruppert also stated that he understood his rights, according to Birkenheier's testimony.

After Creach was advised of his rights, he told Officer Glanz that on September 25, 1973, at about 1:30 in the morning, he and Ruppert decided to go to Ohio in the victim's Cadillac. They went to her apartment and she gave them permission to use the car as well as $50 for the trip. She also gave Creach the title and registration documents for the car so he could sell it for her there. Creach intended to find work in Ohio. During the questioning Officer Glanz observed blood spots on Creach's

jacket and he asked him to remove the jacket. Creach told Glanz that he was wearing the same clothes as he had on when he left for Ohio. Subsequently at trial the jacket was admitted into evidence.

At this point Detective Kirkham arrived and told Officer Glanz that Ruppert was cooperating and that they were going to recover the gun. Glanz told Creach of this, but he persisted in his version of what had taken place, showing Glanz the title and registration papers he said Irion had given him. However, when the gun was recovered and brought to the station at about 2:30 p.m., Glanz showed it to Creach and Creach began crying, saying "I killed her, I killed her. She would not let me use her car to go to Ohio." Creach then related a different version of what had occurred. He and Ruppert went to the victim's apartment to get her Cadillac for the Ohio trip, but she refused. Creach argued with her and attempted to remove a gun from a night stand where he knew she kept it. She saw him, managed to take it from him, but then he recovered it. They decided to take a ride in the car, something Creach said they often did when they argued. Irion did not want Ruppert to go along but Creach insisted that he be allowed to come. Irion drove them to the location between the railroad tracks where they had parked many times before. She stopped the car and she and Creach began to argue again. In the course of the argument Irion grabbed Creach's neck and began choking him. His throat was very tender from prior throat operations and he became enraged. He took out a pocket knife and slashed Irion's throat. She got out of the car and he followed her, stabbing her several times in the back. She walked away but Creach again approached and she began to choke him again. He stabbed her several times in the front part of her body and she fell to the ground. She called to him that she loved him and he told her that he would take her to the hospital. As he bent over her she again began to choke him. Creach pulled out his gun and fired it until it would not fire anymore. He jumped back in the car and drove with Ruppert to Ohio. They did not discover the purse in the car until they had left the scene, and Creach threw the purse into a river in Ohio. Creach explained a bandage on his finger, stating that he had cut himself while stabbing Irion. Glanz received from Creach $45, which had been taken from Irion's purse, and a small pocket knife. Creach told Glanz that this was not the knife he had used to stab Irion; he had dropped that knife near the stabbing location. The currency, the small pocket knife, and the title and registration papers were all introduced into evidence at trial.

After making this statement Creach asked to speak to his mother, who was at the station. Glanz brought her in and she said to Creach "Did you kill her?" He responded "She should have never touched my neck." Creach's mother called a lawyer and after he arrived Creach declined to give a written statement. This was at about 3 p.m.

Later that evening Glanz brought Creach fresh clothes so his clothes could be inventoried. While changing, Creach rubbed a small wound on his shin, commenting that he thought one of the bullets had ricocheted and hit him in the leg. Glanz asked if he meant off her head and Creach responded "no, off of one of the railroad tracks."

The questioning of Ruppert also began at about 11:30 a.m., after Officer Birkenheier had read him his rights from the preprinted form, which Ruppert then signed. Ruppert stated that he went with Creach to Delores Irion's apartment. Ruppert stayed outside and Creach went up to the apartment, returned, and went up again. Ruppert and Creach then got into Irion's Cadillac and went to Ohio. They bought a tire and gasoline on the way.

Between 12:15 and 12:30 p.m. Officer Hennegan came in to question Ruppert, and Officer Birkenheier left. Hennegan advised Ruppert of all his *Miranda* rights and Ruppert stated that he understood them. Hennegan asked Ruppert how they had gotten the victim's car. Ruppert first stated that she had voluntarily loaned Creach and him the car and currency for the trip to Ohio. Hennegan told Ruppert he did not believe him, to which Ruppert responded "Danny did it." He then related that at 11 p.m. on September 24 he went to the area of Delores Irion's home with Creach. She had a 1966 Cadillac parked in Creach's garage at 5717 N. Magnolia in Chicago. Ruppert waited in that car while Creach went to Irion's apartment. A short time later Creach returned and said he tried to steal money from Irion but she had caught him and he had to return it. Creach went back to the apartment and returned with a .25-caliber automatic pistol he said he had taken from Irion. At that time they parked Irion's car in an alley. Ruppert stayed with the car and Creach went to the apartment for a third time, returning with Irion. Ruppert and Creach told her they needed a ride and she agreed to take them. The three entered the car, Irion at the wheel, Creach beside her and Ruppert in back. They directed her to an area in Evanston. When they reached the vicinity of South Boulevard and Chicago in Evanston Creach told Irion to drive up a CTA right-of-way. She refused and drove past the location. Creach told her to drive there or he would kill her. She drove four blocks north to the northern entrance of the right-of-way and then drove onto it, stopping the car some distance into the road. Creach produced a pocket knife, reached over and cut the victim on the throat. She got out, as did Creach and Ruppert. She held her throat asking for a rag. Ruppert found one in the car, handed it to her and she held it to her throat. She asked to be taken to a hospital and Creach and Ruppert agreed. They all got into the car, this time with Creach at the wheel, Irion beside him and Ruppert again in the back. Creach reached over and put his arm around Irion's shoulders and stabbed her in the back. All three exited the car and Irion asked for help,

saying she wanted to be taken to the hospital. Creach and Ruppert agreed. Irion got in behind the wheel and Ruppert got in beside her. But Creach walked to the driver's side and began firing a pistol through the open window in Irion's direction. As he began to fire Ruppert got out on the passenger's side and Irion followed him out and began to run down the right-of-way. Creach pursued and caught up with her a short distance from the car. There was a short struggle, Creach fired another shot, and Irion fell to the ground. Creach and Ruppert got back in the car and drove from the area. (On cross-examination Hennegan recalled that Ruppert told him that before they got in the car at this point Creach told him to get in.) The victim's purse was in the back seat and from it they took a Master Charge credit card and $140, which they divided evenly. They bought gasoline with the credit card on the way to Hamilton, Ohio, where they stayed overnight. The next day they returned to Chicago, parking the car near the CTA tracks at Belmont where they secreted the pistol, a box of .25-caliber ammunition, and a man's wristwatch in the support beam of the tracks. They then took the elevated train to Creach's home.

Hennegan asked Ruppert if he would take him to where these items were hidden, and Ruppert agreed to do so. On the way Hennegan asked Ruppert why he had taken the victim onto the CTA right-of-way. Ruppert stated that he intended to rob her at that location. Hennegan also asked about Ruppert's activities in Ohio. He said they had spoken to two of Creach's relatives, Delbert Smith and Albert Smith. Creach had showed Delbert Smith the .25-caliber automatic. Creach told Albert Smith that he had hit a woman the night before, but later said he was only kidding. In Ohio they had used Irion's credit card in an attempt to purchase stereo equipment and jewelry but a department store manager took the card from them. After this conversation Ruppert led the police to the location of the hidden items and they were recovered. At trial Irion's former boyfriend, Sander Hollabeck, identified the gun and the wristwatch as items he had bought and had last seen in the victim's apartment in September 1973. Those items and the box of ammunition were admitted into evidence at trial.

Ruppert was returned to the station where Hennegan informed Assistant State's Attorney, John Divane, of the developments. Divane testified at the motion to suppress that at this time, about 3 p.m., he spoke to Ruppert, advising him of his *Miranda* rights, which Ruppert said he understood. Ruppert then made an oral statement to Divane. That statement was not introduced at trial, but Divane did state during the suppression hearing that it was substantially the same as a statement subsequently taken from the defendant and transcribed by a court reporter in the presence of Officer Hennegan. At trial that written

statement was introduced into evidence. It was taken at about 3:15 p.m. Divane again advised Ruppert of his *Miranda* rights before he took this second statement, and then a third time as he began to take the statement, except that the third warning did not include the advice that his statement could be used against him. Ruppert then gave a statement which was substantially the same as that he gave to Officer Hennegan, with the following additions. Delores Irion's home was at 5709 Magnolia. They intended to take her car without her permission. When Irion came out of the apartment with Creach she told Ruppert to get out of the car and he did so. Creach told Irion Ruppert was coming, and told Ruppert to get in. Ruppert first refused but Creach kept telling him to get in and he ultimately did so. Creach told Irion he wanted her to drive him some place. She did not want to but then got in and started driving. After Ruppert gave Irion the rag for her throat, Creach "made us all get back in the car." And after Creach first stabbed Irion and all three got out of the car, Ruppert told Creach he should take her to the hospital because she was bleeding badly, but Creach refused. During the trip to Ohio Creach kept the gun on the front seat. When they bought gasoline with the credit card, Ruppert signed for it. In Hamilton, Ohio, Creach told Ruppert to "put a rock on the purse." He did so and gave it to Creach, who threw it into a lake. Creach took half the money in Irion's purse and gave the other half to Ruppert. In the written statement Ruppert identified a gun as the one recovered from the elevated tracks and used before that by Creach to kill Irion.

After Ruppert gave this statement Hennegan asked Ruppert if he had any of the money left that was taken from Irion. He said he had $24 left, and gave it to Hennegan. This money was introduced into evidence at trial.

### 2.

■■ Defendant Creach contends that because he was not warned of his *Miranda* rights prior to his statement concerning the location of the Cadillac, that statement should have been suppressed along with any evidence concerning the Cadillac and evidence found in it. Although we agree that derivative evidence obtained as the result of a *Miranda* violation should be suppressed along with any statements made (*Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357; *U.S. ex rel. Hudson v. Cannon* (7th Cir. 1976), 529 F.2d 890), we find no *Miranda* violation on these facts. Creach's statement came in response to a question from his mother, who was in the police car because the police had granted her request to accompany her son to the station. There is no basis in the evidence to support defendant's speculation that the police had intentionally used defendant's mother to obtain this

information, consequently this was not a police or police-directed question which would require a prior *Miranda* warning. (*People v. Hawkins* (1972), 53 Ill. 2d 181, 290 N.E.2d 231; *People v. Brooks* (1972), 51 Ill. 2d 156, 281 N.E.2d 326; compare *Commonwealth v. Bordner* (1968), 432 Pa. 405, 247 A.2d 612.) Creach was given all the *Miranda* rights at the police station prior to police questioning and he makes no contention on appeal concerning the voluntariness of his statements made there.

■ But when defendant Ruppert was initially advised of his rights at the station he was not specifically advised that he had a right to counsel during any questioning. His rights were read to him from a form which stated:

> "I, Thomas A. Ruppert, have been advised of my rights by officers of the Evanston, Illinois, Police Department. I have been told that I have the right to remain silent and that anything I say can and will be used against me in a court of law, and I have the right to the presence of an attorney to assist me prior to any questioning if I so desire, and also, that if I cannot afford an attorney, I have the right to have an attorney appointed for me prior to any questioning.

> Having been advised of those rights, I, Thomas A. Ruppert, agree to waive those rights and to answer the questions that the officers ask of me."

Defendant Ruppert correctly points out that the court in *Miranda* made clear that the right to counsel, of which a defendant must be warned before questioning, includes the right to have a lawyer present during any interrogation. The better practice would be to explicitly advise a defendant of that facet of his right to counsel, but our examination of the case law convinces us that the warnings given here were sufficient when viewed as a whole and not in isolated context. Thus in *People v. Gazic* (1975), 30 Ill. App. 3d 1063, 336 N.E.2d 73, a general warning that defendant had a right to consult with a lawyer was held sufficient to warn him of his right to counsel at the interrogation. In *People v. Ward* (1976), 37 Ill. App. 3d 960, 347 N.E.2d 381, informing defendant of his right to obtain the services of a lawyer was deemed sufficient to warn him of his specific right to counsel during questioning. And in *People v. Walker* (1974), 18 Ill. App. 3d 351, 309 N.E.2d 716, it was held that advising defendant that he had a right to an attorney and further advising him that he should obtain one was found to clearly convey to him his right to the presence of an attorney during questioning. Finally, in *People v. Hoffman* (1975), 32 Ill. App. 3d 785, 336 N.E.2d 209, adequate advice of the right to counsel was found where defendant was told he had a right to have an attorney present before any questions were asked and was also told that he could exercise any and all of his *Miranda* rights at any time he

wished. In the instant case, defendant was told that he had a right to the assistance of counsel before being questioned and that if he could not afford one, counsel would be appointed before questioning. We find that this did suffice to inform defendant of his right to counsel under *Miranda.* Contra, *People v. Green* (1973), 14 Ill. App. 3d 972, 304 N.E.2d 32, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3179 (*dictum*, relying on *United States v. Fox* (2d Cir. 1968), 403 F.2d 97; but see *United States v. Lamis* (2d Cir. 1970), 429 F.2d 373, *cert. denied* (1970), 400 U.S. 907, 27 L. Ed. 2d 146, 91 S. Ct. 150; *United States v. Cusumano* (2d Cir. 1970), 429 F.2d 378, *cert. denied* (1970), 400 U.S. 830, 27 L. Ed. 2d 61, 91 S. Ct. 61).

■■ Defendant Ruppert also asserts that because his written statement, taken by Assistant State's Attorney Divane, indicated that Divane did not at that time advise him the statement could be used against him, *Miranda* was violated and the statement should have been suppressed. However, by this point defendant had already been given his *Miranda* warnings four times and there was no requirement that any of them be repeated, consequently the omission of one element in this fifth warning was not error. *People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305; *People v. Beamer* (1978), 59 Ill. App. 3d 855, 376 N.E.2d 368.

### 3(a)

■■ When the police took Ruppert into custody, they did not attempt to notify his parents, nor did they advise him that he had a right to such notification. Ruppert was 17 years old at that time. He contends that the police had the duty to attempt to notify his parents that they had taken him into custody. Section 3—2 of the Juvenile Court Act (Ill. Rev. Stat. 1975, ch. 37, par. 703—2) requires a reasonable attempt at such notification when a minor is taken into custody under section 3—1. (Ill. Rev. Stat. 1975, ch. 37, par. 703—1.) Section 3—1, in conjunction with section 2—1 (Ill. Rev. Stat. 1975, ch. 37, par. 702—1), empowers law enforcement officers to take into temporary custody minors whom they deem to be delinquent, otherwise in need of supervision, neglected, or dependent, as well as for other reasons not relevant here. The State argues that the only potentially relevant status would be delinquency and that even that was not applicable because the statutory definition of a delinquent minor is restricted to those violating a law before their 17th birthday. (Ill. Rev. Stat. 1975, ch. 37, par. 702—2.) Therefore, they contend that notification requirements were not applicable. We need not determine the validity of this argument, however, because it is clear that violation of this notice requirement does not mandate suppression of evidence obtained following that violation. (*People v. Steptore* (1972), 51

Ill. 2d 208, 281 N.E.2d 642; *People v. Zepeda* (1970), 47 Ill. 2d 23, 265 N.E.2d 647.) At most, such a violation constitutes a factor in determining whether subsequent statements were voluntarily made. *In re Stiff* (1975), 32 Ill. App. 3d 971, 336 N.E.2d 619.

### 3(b)

Defendant Ruppert also contends that his statements were not voluntarily made because he did not knowingly and voluntarily waive his rights. Defendant's own suppression-hearing testimony on this point was conflicting. He testified that he understood the rights contained on the form we have cited. But on direct examination he testified he was not aware that his statements could be used against him in court. He also testified that he understood all of the questions asked of him by Assistant State's Attorney Divane, and that he read and understood the written statement he gave to Divane. Ruppert claimed that Officer Hennegan told him he could go home if he told what happened and that if he did not tell, a "lie detector machine" would be used on him. It was stipulated that Hennegan would deny both these assertions.

Dr. Edward Kelleher, a certified psychiatrist and director of the Psychiatric Institute of the circuit court of Cook County, examined defendant Ruppert prior to trial, and testified at the motion to suppress hearing. He found that defendant had an I.Q. of 78, that of a borderline mental retardant individual. Dr. Kelleher testified that this classification meant that a person is slower to learn, though such a person should be able to reach the second year of high school, assuming a good school situation. Dr. Kelleher also stated that an electro-encephalogram showed the defendant had organic brain damage, but that this would not affect learning ability nor I.Q.; the only possible effect he found in the defendant was a possible connection with defendant's tensions, excitability, or a complaint of a rapid heartbeat. During Kelleher's examination of Ruppert, Ruppert understood the questions and made coherent responses. He found no mental illness or psychosis, and it was his opinion that a person of defendant's intelligence level would understand the *Miranda* warnings.

Alfred Kirberg, a special-education teacher, testified that he taught Ruppert from 1969 to 1971 in a special class for 4th to 6th graders. He stated that Ruppert had reached his peak learning capacity at that time, that of a fifth grader or 10-year-old. However, he also testified that he had not seen Ruppert since 1971 and had no opinion regarding his academic level on the date of the death of Delores Irion.

■■ The question of whether defendant Ruppert knowingly and voluntarily waived his *Miranda* rights was for the trial court to determine

based on the totality of the evidence. That determination should not be overturned unless it is contrary to the manifest weight of the evidence. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, 11 Ill. Dec. 262.) We recognize the special care and scrutiny required where a juvenile, especially one classified as a borderline mental retardant, is involved. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) But in this cause there was direct expert testimony indicating that this factor did not affect the voluntariness of Ruppert's waiver. Furthermore, the trial court had the opportunity to observe the testimony of the defendant. The court concluded:

> "Insofar as Mr. Ruppert is concerned I would find that from my evaluation of his testimony, having seen him in fact testify from the stand, respond to questions, the method and mode of his response, his ability to respond, his coherence and conciseness in responding, he impressed me to the extent that I would have to find under these facts that he could in fact knowingly and intelligently waive his constitutional rights."

The court found that defendant Ruppert did knowingly and intelligently waive his *Miranda* rights, and we find that determination to have ample support in the record.

### 4.

Both defendants and the State find support in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, for their contentions concerning the exclusion of their statements and other evidence as the fruit of their illegal arrests. In *Brown* the defendant was arrested without probable cause and without a warrant by police who first broke into his apartment and searched it and then waited there for him to arrive. Defendant was taken to the police station, given his *Miranda* warnings and then questioned. Within two hours of his arrest he had given the police a signed statement concerning his involvement in the murder for which he had been arrested, and later that evening he gave a second statement. The police testimony was that they arrested the defendant so as to question him concerning the murder. Defendant's conviction was affirmed by the Illinois Supreme Court on the ground that the giving of the *Miranda* warnings broke the causal connection between the illegal arrest and the statements, thus permitting their introduction into evidence. The United States Supreme Court reversed, holding that the giving of *Miranda* warnings did not automatically establish that a subsequent confession was not obtained through exploitation of an illegal arrest. The court identified four factors which it deemed relevant to this inquiry: where the *Miranda* requirements were satisfied, the temporal

proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. It was undisputed in *Brown* that the *Miranda* warnings were given and defendant understood them, but the court held this to be insufficient. It noted that less than two hours elapsed between the arrest and the first statement, and found that the second statement was clearly the fruit of the first. It noted that there were no significant intervening circumstances such as those in *Wong Sun*, where defendant Wong Sun's confession was admitted despite his illegal arrest because the confession came only after he had been arraigned and released on his own recognizance. And it held that the illegality of the arrest was purposeful, as the arresting officers admitted that they made the arrest for investigation or questioning. The court also found that the manner of the arrest was apparently calculated to cause surprise and confusion.

In this case it is also clear that the purpose of the arrests of the defendants was for questioning; this was the police testimony. There was not the flagrant action of breaking into a home or making a surprise arrest with guns drawn, but nonetheless the fundamental misconduct remains the same as in *Brown*, making an arrest not on probable cause but only for purposes of taking a suspect into custody for questioning.

Nor were there any significant intervening circumstances between the arrests and the statements. An example of what the court in *Brown* envisioned as an intervening circumstance is found in *Johnson v. Louisiana* (1972), 406 U.S. 356, 32 L. Ed. 2d 152, 92 S. Ct. 1620, cited in *Brown*. There the defendant contended that his line-up identification was the product of his illegal arrest. The court found that because the defendant was brought before a magistrate where bail was set and he was advised of his rights and then had an attorney present during his line-up identification, there existed intervening circumstances breaking the causal connection between the allegedly illegal arrest and the identification.

As for temporal proximity, defendant Creach's first statement after his arrest, concerning the location of the Cadillac, came only moments after his arrest. The defendants' first substantive confessions were within several hours of their arrests, and all their statements admitted at trial were made on the same day as their arrest. This situation is analogous to that in *Brown*, and differs from cases cited in *Brown* to illustrate what would constitute a time sequence establishing attenuation: *United States v. Owen* (5th Cir. 1974), 492 F.2d 1100, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 227 (four days after release from custody defendant voluntarily returned and spoke to the authorities), and *Commonwealth of Pennsylvania ex rel. Craig v. Maroney* (3d Cir. 1965), 348 F.2d 22, *cert. denied* (1966), 384 U.S. 1019, 16 L. Ed. 2d 1042, 86 S. Ct.

1966 (five days between the arrest and the confession, during which time defendant was arraigned and was specifically advised by his attorney not to make any statements). Nor was the court concerned strictly with the passage of time in evaluating this factor, for it cited the case of *Hale v. Henderson* (6th Cir. 1973), 485 F.2d 266, *cert. denied* (1974), 415 U.S. 930, 39 L. Ed. 2d 489, 94 S. Ct. 1442, where a defendant's confession made 42 hours into the period of his custody was excluded even though he had talked privately with his wife during that time, because there was no break in custody and little break, if any, in his custodial interrogation.

■■ Thus, the only factor tending to support the admissibility of the evidence obtained by questioning the defendants is that they were given their *Miranda* rights before statements were taken at the police station. We find that this factor by itself was not sufficient to break the causal connection between the illegal arrests and the defendants' statements. Accordingly, the statements of the defendants and the evidence obtained as the result of those statements should have been suppressed. This includes defendant Creach's statement in the police car concerning the location of the Cadillac. Even though we have found no *Miranda* violation as to this statement, the absence of any prior *Miranda* warnings provides support for our finding that the statement was the product of defendant Creach's illegal arrest. Nor do we find the fact that the questioning was initiated by Creach's mother to be a sufficient intervening cause. The police joined in this questioning by asking how to get to the address given, and once there they asked who had the keys.[1] They thus provided the opportunity for Creach to make statements to his mother in their presence without warning him of possible consequences, and when that questioning was initiated they participated in it. This constituted exploitation of the illegal arrest and required suppression of the statement obtained as well as the evidence provided by the Cadillac itself.

At trial the defendants' statements constituted the basis of the evidence against them. Physical evidence obtained as the result of their statements, such as the gun and other evidence hidden by the defendants, the money they obtained from the victim's purse, their fingerprints from the Cadillac, and other evidence found in that car were used to corroborate those statements. We believe the admission of this evidence

---

[1] Defendants have not raised the issue of whether these questions, which followed defendant Creach's statement to his mother, should have been preceded by *Miranda* warnings. Most of the information concerning these questions and the responses to them was adduced only at the hearing on the motion to suppress. At trial the testimony indicated only that someone in the car gave directions on how to get to Broadway and Belmont; there was no testimony that the car keys were demanded or produced. We need not consider the issue here, for any such testimony, as well as the car keys, would be inadmissible as the fruit of the illegal arrests, without regard to whether *Miranda* was also violated.

was prejudicial error, and it requires that defendants' convictions be reversed and the cause remanded for a new trial without the use of this evidence.

### 5.

■■ Defendant Creach also contends that the admission of his co-defendant Ruppert's statement, containing matters incriminating to Creach, constituted a *Bruton* violation (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620), because Ruppert was not available at trial for cross-examination. But where, as here, the jury also hears defendant's own incriminating statements, amounting to a confession of the crime, there is no prejudicial error (*People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136), and perhaps not even harmless error. *People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359.

### 6(a)

Creach's defense at trial was insanity, and he contends that the State failed to prove beyond a reasonable doubt that he was sane at the time he committed the offenses at issue. Defendant presented the testimony of six lay witnesses on this issue. His mother testified that he was frequently beaten by his father and step-father and that she, too, was regularly beaten by his father in his presence. She also stated that Creach had taken drugs since he was in the second grade. Defendant Creach's cousin recalled two incidents in which Creach had intentionally driven a car into a garage wall and had thrown a dart into the cousin's leg; his opinion was that Creach was crazy. A neighbor testified that she had once attempted to intercede in an argument between Creach and his mother, and Creach struck the neighbor repeatedly. It was the neighbor's opinion, when asked of Creach's sanity, that he was "extremely angry." A female friend of the defendant testified to defendant's frequent drug usage, stating that when he took "speed" he drove his car wildly and would sometimes pass out. Her opinion was that Creach was not sane. Defendant's brother testified that Creach took drugs and "sniffed" glue frequently; his opinion was that around September 1973 defendant was "getting kind of crazy." Another friend of the defendant testified that on one occasion Creach could not remember what he had done earlier, and on another occasion she rode in a car with him when he drove recklessly, striking several cars and running through a fence; when she ran away he chased her and struck her. Her opinion was that in the summer of 1973 Creach was "nuts." Dr. Walter Feldman, a psychiatrist and attorney, examined Creach on three occasions in October 1974, and directed psychological tests of him. In

response to a hypothetical question which included the incidents to which the lay witnesses had testified as well as the facts of the murder of Delores Irion, Dr. Feldman testified that in his opinion, the hypothetical subject of the question was, on September 25, 1973, suffering from a mental disease or defect and as a result was unable to conform his conduct to the requirements of the law. Dr. Feldman equated a mental disease or defect with "impaired function."

In rebuttal the State presented the testimony of Dr. Kelleher, who examined the defendant twice in January 1975 and administered a number of psychological tests. Dr. Kelleher found no psychoses, no neuroses and no mental illness, though he did believe defendant attempted to feign amnesia concerning the killing of Delores Irion. Dr. Kelleher's opinion was that defendant was sane at the time of the killing. The State also presented the lay testimony of Officers Birkenheier, Glanz, and Kirkham, and Assistant State's Attorney Divane, that based on their observation of Creach the day after the killing they believed him to be sane.

■■ ■ This question of defendant's mental condition at the time of the crime was for the jurors to determine as the triers of fact. (*People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.) They were at liberty to accept or reject the testimony of the various lay and expert witnesses. (*People v. Sims* (1976), 35 Ill. App. 3d 401, 342 N.E.2d 256.) The evidence tending to establish defendant Creach's sanity is ample and the jury's resolution of that question is not so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's sanity; for that reason we will not disturb that determination. *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.

### 6(b)

■■ Nor do we find merit in defendant Ruppert's contention that his guilt as to the armed robbery was not established beyond a reasonable doubt. Defendant's conviction was based on a theory of accountability, as codified by Sections 5—1 and 5—2 of the Criminal Code. (Ill. Rev. Stat. 1975, ch. 38, pars. 5—1, 5—2.) Section 5—2 states in relevant part:

> "A person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. * * *"

Some useful principles in determining accountability were set forth in *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, quoting from the appellate court decision which the supreme court was affirming:

> "Mere presence or negative acquiescence is not enough to make one a principal to a crime. [Citations.] However, a person may aid or abet without actively participating in the overt act and if the proof shows that he was present at the commission of the crime without disapproving or opposing it, the trier of fact may consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval, and was thereby aiding and abetting it. [Citations.]" (67 Ill. 2d 1, 8-9, 364 N.E.2d 56, 60.)

In *Morgan* several people agreed to rob the victim. The defendant agreed, according to his own statement, to do nothing but accompany the others to the scene. No evidence was introduced as to what defendant did during the robbery, but there was evidence that afterward he divided the proceeds with the others. This evidence was found sufficient to convict the defendant of armed robbery as well as the murder of the victim, who was killed in the course of the robbery. In this cause there was testimony that defendant admitted he intended to rob Delores Irion when he went to Evanston with her and Creach. There was also evidence showing that Ruppert admitted that he and Creach were planning to take the victim's car to Ohio without her permission. During the killing of Irion defendant Ruppert stood by and did nothing to attempt to intercede. By his own admission he took half of the victim's money when Creach offered it to him, and he used the victim's credit card to make purchases. This evidence, if believed by the jury, was sufficient to establish defendant Ruppert's accountability for the armed robbery of Delores Irion.

### 7.

But defendant Ruppert also alleges error in the refusal of the trial court to instruct the jury on the affirmative defense of compulsion. The instruction requested by Ruppert states:

> "It is a defense to the charge made against a defendant that he acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believed death or great bodily harm would be inflicted upon him if he did not perform the conduct with which he is charged." (Illinois Pattern Jury Instructions, Criminal, No. 24.21 (1968).)

As we have noted, compulsion is an affirmative defense. (Ill. Rev. Stat. 1975, ch. 38, pars. 7—11, 7—14.) By statute, unless the State's evidence raises the issue, the defendant must raise it by presenting "some

evidence"; once the issue is raised the State must prove defendant guilty as to this issue along with the other elements of the crime. (Ill. Rev. Stat. 1975, ch. 38, par. 3—2.) The case law in this State is conflicting as to the quantum of evidence necessary to raise such an affirmative defense. Generally an instruction is justified even where only very slight evidence supporting it is in the record. (*People v. Kalpak* (1957), 10 Ill. 2d 411, 140 N.E.2d 726.) And this standard has been applied to instructions on affirmative defenses. (*People v. Adcock* (1975), 29 Ill. App. 3d 917, 331 N.E.2d 573 (compulsion); *People v. Cruz* (1978), 66 Ill. App. 3d 760, 384 N.E.2d 137 (self-defense); *People v. Looney* (1977), 46 Ill. App. 3d 404, 361 N.E.2d 18 (self-defense).) However, in *People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321, the Illinois Supreme Court held that the affirmative defense of insanity was raised only where evidence on the issue was sufficient to raise a reasonable doubt as to the defendant's sanity. Although that opinion specifically concerned only insanity, the court relied on the Committee Comments relating generally to affirmative defenses (Ill. Ann. Stat., ch. 38, par. 3—2, Committee Comments, at 192-93 (Smith-Hurd 1972)), wherein it was noted that unless the evidence was sufficient to warrant submitting the issue to the jury and to raise a reasonable doubt as to the defendant's guilt, it would be of little benefit to the defendant.

■■ We need not determine which standard is applicable, for even under the stricter standard of *Redmond* we find that an instruction on compulsion was warranted. There was evidence indicating that from the time Creach emerged with Delores Irion from her apartment, he was armed with a gun. According to Ruppert's statements, which the State introduced into the record, when Irion and Creach first came out of the apartment, Irion told Ruppert to leave the car, and he complied. But then Creach told him to get back in; after first refusing, Ruppert finally got back in when Creach repeatedly told him to do so. In Ruppert's statement he also recalled that after Irion's throat had been cut and he had given her a rag, Creach made them both get back in the car. And after Creach had shot and apparently killed Irion, he again told Ruppert to get back in the car, and Ruppert complied. Finally, it was part of Ruppert's statement that on the way to Ohio, Creach kept the gun out on the front seat of the car. These factors could have been sufficient to raise a reasonable doubt in the minds of the jurors as to defendant's accountability; certainly they were "some evidence" of compulsion. The failure to give this instruction was error and constitutes an independent basis for the reversal of defendant Ruppert's conviction and remandment for a new trial.

■■ Finally, we find no merit in defendant Ruppert's contention that the trial court erred in failing to give his proposed instructions on accountability and accessories after the fact. The court properly gave the

IPI instruction on accountability. That instruction specified that accountability was to be based on defendant's actions or intent before and during the offense; thus the jury was made aware that Ruppert could not be held accountable for Creach's actions because he had acted to conceal the crime or to help Creach escape. Because the jury was adequately instructed on this defense theory by the IPI instruction on accountability, the court did not err in refusing Ruppert's instruction which covered the same issue in a different manner. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.

Accordingly, for the reasons set forth in this opinion, the convictions of the defendants are reversed and the cause is remanded for retrial.

Reversed and remanded.

JOHNSON, J., concurs.

Mr. JUSTICE LINN, dissenting:

I must respectfully dissent from the majority's holding: (1) that defendant, John Creach, was arrested without probable cause;[1] (2) that Creach's inculpatory statements, as well as certain other evidence presented against him, must be suppressed as fruit of the poisonous tree; and (3) that the trial court erred in not instructing the jury on the affirmative defense of compulsion with regard to defendant Ruppert.

I

The majority correctly concludes that defendant Creach was placed under arrest by Evanston police officers at the Magnolia Street location. (See, *e.g., People v. Pruitt* (1967), 79 Ill. App. 2d 209, 216-17, 223 N.E.2d 537, 541-42.) The constitutional validity of his arrest focuses upon whether the police officers had probable cause to believe Creach had committed an offense. *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168; Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c); *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.

At the conclusion of lengthy hearings on the motions to suppress, the trial court found that the Evanston police officers did have probable cause to arrest Creach.[2] This finding may be disturbed on appeal *only* if it is "manifestly erroneous." (*People v. Clay* (1973), 55 Ill. 2d 501, 505, 304

---

[1] Since I agree with the majority that the Evanston police officers lacked probable cause to arrest defendant, Ruppert, I will not discuss that aspect of the case in this dissent.

[2] The majority contends that on a subsequent "motion to reconsider" the trial court recanted its holding and found that the Evanston police officers did *not* have probable cause to arrest Creach. I cannot agree. A reading of the motion to reconsider, the memorandum of law submitted in support thereof, and the corresponding arguments of counsel demonstrates that *neither defendant requested* a reconsideration of the trial court's earlier finding that probable cause to arrest did exist. Rather, in light of what were then recent cases, each defendant asked the trial court to reconsider its earlier finding that the Evanston police

N.E.2d 280, 282.) It must also be remembered that Creach had the burden of proving that his arrest was based on less than probable cause. (*People v. Ross* (1978), 60 Ill. App. 3d 857, 377 N.E.2d 230.) I *cannot* conclude that Creach met this burden or that the trial court's finding is manifestly erroneous.

Probable cause to arrest refers to that quantum of information which would lead a reasonable and prudent police officer to believe the defendant *probably* committed an offense. (*People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) This information need *not* be sufficient to establish guilt beyond a reasonable doubt (*Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329), nor must it be sufficient to prove guilt is more probable than not. All that is necessary, is that the information, upon which the arrest is based, constitute reasonable grounds for believing that guilt is more than a mere possibility.[3]

Probable cause should be viewed from the vantage point of a police officer's training and experience, and "must be judged on the basis of [his] responsibility to prevent crime and to catch criminals." (*People v. Robinson* (1976), 62 Ill. 2d 273, 277, 342 N.E.2d 356, 358.) As our supreme court recently stated in *People v. Blitz* (1977), 68 Ill. 2d 287, 292-93, 369 N.E.2d 1238, 2140-41, quoting from *United States v. Davis* (D.C. Cir. 1972), 458 F.2d 819, 821:

> "Probable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine 'philosophical concept existing in a vacuum,' *Bell v. United States*, 102 U.S. App. D.C. 383, 386, 254 F.2d 82, 85 (1958), but rather it requires a pragmatic analysis of 'everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 1310, 93 L. Ed. 1879 (1949). It is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training. *Jackson v. United States*, 112 U.S. App. D.C. 260, 302 F.2d 194 (1962). It is 'a plastic concept whose existence depends on the facts and circumstances of the particular case.' *Bailey v. United States*, 128 U.S. App. D.C. 354, 357, 389 F.2d 305, 308 (1967). See *McCray v. Illinois*, 386 U.S. 300, 304, 87 S. Ct. 1056, 18 L. Ed. 2d 62 (1967); *Beck v. Ohio, supra*, 379 U.S. [89]

---

officers did have jurisdiction to arrest them in Chicago. Despite the statements of the trial court quoted by the majority, in my view, the trial court's denial of the motion to reconsider left intact its earlier holding which denied the defendants' motions to suppress and found that probable cause and jurisdiction to arrest did exist.

[3] " 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' (Citations.)" (*Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310.) "The test is essentially one of reasonableness." *People v. Payne* (1972), 6 Ill. App. 3d 378, 380, 286 N.E.2d 35, 36.

at 91, 85 S. Ct. 223, [13 L. Ed. 2d 142]; *Brinegar v. United States, supra,* 338 U.S. at 175-176, 69 S. Ct. 1302. Because of the kaleidoscopic myriad that goes into the probable cause mix 'seldom does a decision in one case handily dispose of the next.' *Hinton v. United States,* 137 U.S. App. D.C. 388, 391, 424 F.2d 876, 879 (1969). It is however the totality of these facts and circumstances which is the relevant consideration. *Davis v. United States,* 133 U.S. App. D.C. 172, 173, 409 F.2d 458, 459 (1969); *Dixon v. United States,* 111 U.S. App. D.C. 305, 306, 296 F.2d 427, 428 (1961). Viewed singly these factors may not be dispositive, yet when viewed in unison the puzzle may fit."

A well-trained professional utilizes the unique talent and experience gained through his work. The professional police investigator is no exception. He will apply his skill and technical knowledge in carefully analyzing and evaluating all available data relating to the criminal activity which is the subject of his inquiry. The police investigator's experience-honed power of analytical conceptualization often "glues" together stray pieces of a particularly difficult puzzle, thereby giving rise to a reasonable probability that the crime involved was committed by a known suspect.

When the court applies legal standards to the probable cause issue presented by a particular case, it must remain aware of and give due deference to the police investigator's professionalism and experience and also his ability to decipher meaning from what may superficially appear to be innocent facts and circumstances. Furthermore, since many of the situations which law enforcement officers confront are more or less ambiguous, courts, by necessity, permit them broad discretion in determining whether probable cause to arrest does exist. *Brinegar v. United States* (1949), 338 U.S. 160, 176, 93 L. Ed. 1879, 1891, 69 S. Ct. 1302, 1311; *People v. Wright* (1974), 56 Ill. 2d 523, 529, 309 N.E.2d 537, 540; see, *e.g., People v. Coleman* (1978), 63 Ill. App. 3d 814, 380 N.E.2d 829.

In this case, the Evanston police officers possessed the following information at the time they arrested defendant Creach: Delores Irion's body was found in Evanston at approximately 7 a.m. on September 25, 1973. She had been shot three times with a .25-caliber automatic pistol, twice in the head and once in the back, and also stabbed 12 times, in the back, chest, abdomen and knee. An empty box for a .25-caliber automatic pistol was found in Delores Irion's apartment. The apartment had been locked with a key when the police reached it. Despite having rained heavily the night before, Delores Irion's clothing was dry, suggesting she had been killed sometime after midnight. The victim's automobile, a 1966 Cadillac, was missing. The police were informed that John Creach, the son of Mrs. Dolly Moore, the victim's next door neighbor, had been living

with Ms. Irion for the past month. During this time, Creach had been driving Delores Irion's automobile. Mrs. Moore informed police that Creach had called her from Ohio. Creach told his mother he had Delores Irion's 1966 Cadillac and had last seen her alive at 1:30 a.m., the morning of September 25, when he had left for Ohio in her car. Creach was in Ohio with a friend named Tom. When Creach was informed by his mother of Delores Irion's death, he told her he would drive back to Chicago right away. No explanation was offered as to why Creach had suddenly taken the victim's automobile and left for Ohio at 1:30 a.m. The police department's investigation indicated that Creach was the last person to see Delores Irion alive.

Although these factors viewed individually may not be dispositive of the probable cause issue, their sum total dictates only one conclusion: the Evanston police officers had a reasonable basis for their belief that Creach probably murdered Delores Irion. Consequently, their arrest of Creach was legally justified. It must be borne in mind that probability is the touchstone, not certainty. Based upon this information, I readily conclude that the trial court's finding of probable cause was proper.

The majority questions whether certain factors listed above may properly be considered in our review of the probable cause to arrest issue. Although not revealed at the motion to suppress hearing, it was later disclosed at trial that the Evanston police department had obtained the following information, prior to arresting Creach: (1) Delores Irion had been shot with a .25-caliber pistol; (2) a box for a .25-caliber pistol had been found in her apartment; and (3) the apartment was locked with a key when the police reached it. According to the majority, the two arresting officers were not personally aware of this information when they took Creach into custody.

I believe that even without this information the police officers had probable cause to arrest Creach. Additionally, although this information was not presented at the motion to suppress hearing, it may properly be considered by us in reviewing defendant's contention that the trial court erred in finding probable cause to arrest did exist. *People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808; *People v. Glanton* (1975), 33 Ill. App. 3d 124, 338 N.E.2d 30.

The fact the arresting officers may not have had this information within their personal knowledge, at the time Creach was taken into custody, is irrelevant. Probable cause must be evaluated on the basis of the *collective* information possessed by the law enforcement agency or particular investigative unit involved, rather than solely upon the information possessed by the officers who actually make the arrest. (*People v. Parks* (1971), 48 Ill. 2d 232, 269 N.E.2d 484, *cert. denied* (1972), 404 U.S. 1020, 30 L. Ed. 2d 669, 92 S. Ct. 692; *People v. Beard* (1976), 35

Ill. App. 3d 725, 342 N.E.2d 343; *United States v. Stratton* (8th Cir. 1972), 453 F.2d 36, *cert. denied* (1972), 405 U.S. 1069, 31 L. Ed. 2d 800, 92 S. Ct. 1515; *Smith v. United States* (D.C. Cir. 1966), 358 F.2d 833.) As one court stated:

> "Defendant argues that because the arresting officer did not have sufficient knowledge or information to establish probable cause, the arrest was illegal. This is not the correct test. The test is whether the law-enforcement agency as a corporate body possessed sufficient information to establish probable cause. (Citations.) In this case probable cause was established by all (the) information possessed by the police as a unit and therefore the arrest was lawful." *State v. Stark* (1970), 288 Minn. 286, 290-91, 179 N.W.2d 597, 600, *cert. denied*, 402 U.S. 930, 91 S. Ct. 1529, 28 L. Ed. 2d 864; accord, *Johnson v. State* (1977), 75 Wis.2d 344, 249 N.W.2d 593.

The record in this case discloses that several officers of the Evanston police department were working in close concert with one another in investigating Delores Irion's murder. The record also demonstrates that information was freely exchanged among these officers during the course of that investigation. Consequently, in light of the above principle, the knowledge of each officer involved in the investigation should be imputed to the rest.

Nevertheless, the majority holds unpersuasively that the above principle is not applicable to this case:

> "[The] ordinary presumption that for purposes of probable cause the knowledge of one officer is imputed to the others involved in the cause [citation], does not apply here, for at the motion to suppress hearing Officer Glanz [one of the arresting officers] was specifically asked whether the knowledge he had described at that hearing was all the information on the case that he [personally] possessed concerning the involvement of defendant Creach, and he stated that it was."

Glanz's statement, however, does not contradict and the majority does not challenge, the testimony later adduced at trial that additional information, at the time of Creach's arrest, was possessed by *other* police officers involved in the investigation. Indeed, Glanz's statement does not even indicate that the other arresting officer, Birkenheier, was ignorant of this additional information. In any event, the above principle correctly demonstrates that the arresting officers need not have been personally aware of all the information possessed by their investigative agency as a unit. Therefore, I fail to understand how Glanz's statement—which merely indicates that he, and possibly his partner, were not personally aware of additional information possessed by other police officers involved in the investigation—renders this principle inapplicable.

Viewing the total circumstances from the vantage point of a police officer's training and experience, I am of the opinion that there was a reasonable basis for the belief that Creach probably murdered Delores Irion. I would, therefore, conclude that his arrest was based upon probable cause, and that the inculpatory statements, as well as the other evidence attributable to his arrest, were properly admitted.

## II

Creach contends that even if probable cause did exist, the Evanston police lacked authority to arrest him in Chicago. I disagree.

The common law rule limited the authority of police officers to the territorial boundaries of the municipality. (*People v. Carnivale* (1975), 61 Ill. 2d 57, 329 N.E.2d 193.) This rule was later modified by sections 7—4—7 and 7—4—8 of the Illinois Municipal Code:

> "The territory which is embraced within the corporate limits of *adjoining municipalities within any county* in this State shall be a police district." (Emphasis added.) Ill. Rev. Stat. 1975, ch. 24, par. 7—4—7.

> "*The police of any municipality in such a police district may go into any part of the district* to suppress a riot, to preserve the peace, and to protect the lives, rights, and property of citizens. For these purposes the mayor of any municipality in the district, and the chiefs of police therein, shall use the police forces under their control anywhere in the district." (Emphasis added.) Ill. Rev. Stat. 1975, ch. 24, par. 7—4—8.[4]

We take judicial notice that Chicago and Evanston are adjoining municipalities within the same county, and, therefore, are part of the same police district. (See *People v. Lawson* (1976), 36 Ill. App. 3d 767, 345 N.E.2d 41.) The question presented is whether the arrest of Creach in Chicago, was within the extraterritorial power bestowed on the Evanston police by section 7—4—8.

The Evanston police were investigating the brutal and savage murder of Delores Irion, a Chicago female resident, whose dead body was found within the municipal boundaries of Evanston. The serious nature of this crime posed a very real threat to the physical safety of the other residents within the police district. The concern generated by this vicious crime was evidenced by the manpower immediately assigned to the case by the Evanston police department.

Early in its investigation, the Evanston police acquired reasonable

[4] The court's statement in *People v. Clark* (1977), 46 Ill. App. 3d 240, 242-43, 360 N.E.2d 1160, 1162-63, that the "hot" pursuit theory is the only exception to the common law rule limiting a police officer's authority to the boundaries of his own municipality, is clearly erroneous.

grounds to believe that defendant, Creach, had murdered Delores Irion. They also had reason to believe that Creach had fled to Ohio following the culmination of his act. Creach's mother informed them that when her son had called from Ohio and was informed of Delores Irion's murder, he volunteered to return to Chicago "right away." Creach was expected to return to Chicago the night of September 25. He did not show.

In the early morning hours of September 26, Officers Glanz and Birkenheier were patrolling the Chicago neighborhood where Creach and the victim had lived in search of Delores Irion's automobile. At approximately 9:30 a.m., they spotted Creach walking down the street toward his mother's home. In my view, the arrest of Creach at this time was necessary "to preserve the peace, and to protect the lives, [and] rights, * * * of citizens." (Ill. Rev. Stat. 1975, ch. 24, par. 7—4—8.) It would have been absurd and dangerous for the Evanston police officers, under the facts presented by this case, to have dropped everything, and awaited the arrival of a Chicago police officer before placing Creach under arrest. I would, therefore, conclude that the Evanston police had authority to arrest Creach in Chicago.

### III

The majority holds that the trial court erred, with regard to defendant Ruppert, in refusing to instruct the jury on the affirmative defense of compulsion (Ill. Rev. Stat. 1975, ch. 38, pars. 7—11, 7—14). I disagree.

Confusion has been generated with regard to the quantum of evidence which must be introduced to raise the issue of an affirmative defense (see Ill. Rev. Stat. 1975, ch. 38, par. 3—2), and, thereby, to warrant the submission of an instruction to the jury on that defense. Most cases indicate that a jury instruction on an affirmative defense is warranted even though only slight evidence is presented in support thereof. (See, e.g., People v. Looney (1977), 46 Ill. App. 3d 404, 361 N.E.2d 18.) The State contends, however, that in People v. Redmond (1974), 59 Ill. 2d 328, 320 N.E.2d 321, the Illinois Supreme Court intimated a stricter standard: that a jury instruction on an affirmative defense should be submitted only where the evidence presented in support thereof is sufficient to raise a reasonable doubt of defendant's guilt.

While I have serious reservations with regard to the State's broad interpretation of Redmond, I find it unnecessary to determine which standard is applicable to this case. For, in my view, the evidence presented was insufficient, under either standard, to warrant submitting an instruction to the jury on the defense of compulsion.

The evidence presented at trial demonstrates that Ruppert and

Creach had planned to steal money from Delores Irion, Creach's girlfriend, and then drive to Ohio in her car. Ruppert waited in Delores Irion's Cadillac while Creach entered the victim's apartment. When Creach returned a short time later he told Ruppert Ms. Irion had caught him trying to steal some of her money. Creach then returned to the apartment and emerged with a .25-caliber pistol he had taken from the victim. Creach went back to the apartment yet a third time, and returned with Delores Irion.

In finding that an instruction on compulsion was warranted, the majority relies on the following evidence:

> "[W]hen Irion and Creach * * * came out of the apartment, Irion told Ruppert to leave the car, and he complied. But then Creach told him to get back in; after first refusing, Ruppert finally got back in when Creach repeatedly told him to do so. In Ruppert's statement he also recalled that after Irion's throat had been cut and he had given her a rag, Creach made them both get back in the car. And after Creach had shot and apparently killed Irion, he again told Ruppert to get back in the car, and Ruppert complied. Finally, it was part of Ruppert's statement that on the way to Ohio, Creach kept the gun out on the front seat of the car."

This evidence merely indicates that Creach was the leader of the two men with regard to the armed robbery and murder scenario. There is no evidence to support Ruppert's claim that his conduct was compelled under threat of death or great bodily harm. Creach never threatened Ruppert, verbally, physically, or even by implication, with the .25-caliber pistol. Furthermore, Ruppert never mentioned in or out of court that he participated in the armed robbery and murder of Delores Irion because he feared Creach.

Considering the fact that Ruppert admitted he had intended to rob Delores Irion all along, that Ruppert waited in the victim's car for Creach to return, knowing Creach was armed with a dangerous weapon, and that there was no testimony, or evidence whatsoever from which it could be inferred, that Ruppert was in fear for his own safety, the trial court properly refused to instruct the jury on the affirmative defense of compulsion. There was no evidence to support such a defense.

Accordingly, for the reasons stated and to the extent noted, I dissent.