THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WESLEY LEVAN, Defendant-Appellant.

First District (1st Division)   No. 79-2363

Opinion filed August 10, 1981.

James J. Doherty, Public Defender, of. Chicago (Thomas E. Verdun and Suzanne M. Xinos, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Richard F. Burke, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Wesley Levan was arrested at his home at 2927 North Kilpatrick on October 1, 1978, and charged with two counts of armed robbery and two counts of armed violence. (Ill. Rev. Stat. 1977, ch. 38, pars. 18—2(a) and 33A—2.) After a bench trial where defendant raised the defense of compulsion, he was found guilty of armed robbery, not guilty of armed violence, and sentenced to six years imprisonment on each count of armed robbery, the terms to run concurrently. The issues presented for review are: (1) whether the prosecution failed to prove the defendant guilty of armed robbery when it did not disprove beyond a reasonable doubt his defense of compulsion; (2) whether defendant's Federal and State constitutional right to avoid self-incrimination was violated when the prosecution improperly elicited on cross-examination and commented during closing argument on defendant's post-arrest silence; and (3) whether defendant was denied his constitutional right to present a defense.

For the reasons set forth herein the judgment of the circuit court is affirmed.

At trial, Daniel Fowler, one of the complainants, testified that on October 1, 1978, at approximately 12:30 a.m., he and Tim Clarke were sitting on the edge of the lagoon behind Lincoln Park fishing in an area well-lit by the parking lot lights. As he went to cast his pole into the lagoon the hook hit the leg of a person walking to his right whom he identified in court as the defendant. When Fowler recast his pole the hook again struck the defendant who had not moved, and the defendant said, "What the f___." Fowler apologized to the defendant, and then he noticed a person standing over Clarke's left shoulder, later identified as Torrence Gibson,

reach down, put a knife to Tim's neck, and announce this was a robbery. When this happened, defendant put his hand on Fowler's shoulder and told him to keep looking at the water and not to turn around and look. Gibson asked Clarke for his money and his wallet, and after Clarke handed them to Gibson, Gibson came over to Fowler's left shoulder, put a knife to Fowler's neck, and told him he wanted his money and his wallet, which Fowler gave to him. Meanwhile, the defendant went behind Clarke, put his knee in Clarke's back and his hands on Clarke's shoulders and told him to keep looking at the water. Gibson took money and Fowler's high school identification out of his wallet. The identification had Fowler's picture on it as well as his name, address and age. Gibson asked Fowler if that was him on the I.D. and if the address was where he lived, then told him if there was going to be any trouble he would know where to find him and kill him and his family. Fowler asked for his wallet back, and Gibson threw it into the lagoon. When Fowler and Clarke realized that Gibson and the defendant were gone they turned around to look for them, and observed them walking toward LaSalle with a female. Clarke and Fowler went about 50 yards down the lagoon to where Clarke's brother-in-law George and George's brother were also fishing, told them what had happened, and the four of them followed the defendant, Gibson and the woman in George's car to a gas station at North and LaSalle. Fowler tried to call the police but could not find an operable phone; however, they saw a police car drive by and followed it to report the incident. The police drove immediately to the gas station, followed by the four people in George's car; Clarke pointed out Gibson and the police arrested him. They found Clarke's wallet and Fowler's I.D. on Gibson, but the defendant and the woman were no longer on the premises. The testimony of Timothy Clarke was substantially the same as that of Daniel Fowler. On October 2, 1978, both Fowler and Clarke went to the police station where they separately viewed a lineup, and each individually picked defendant out of the lineup as one of the men who had robbed them.

Investigator Fred Stone testified that he has been a robbery investigator with the Chicago Police Department for about eight years. On October 1, 1978, he and his partner, Frank Kajari, both plain-clothes officers, went to 2927 North Kilpatrick for the express purpose of arresting the defendant. Kajari went to the front door, while Stone went to the rear door. Stone heard his partner knock loudly on the door and announce that he was a police officer. At that time Stone saw defendant and a girl come running out the rear door and down the stairs from the porch. He blocked their escape, and placed them under arrest. On October 2, 1978, he conducted a lineup which was viewed individually by each of the complainants herein, who each identified the defendant as one

of the men who had robbed them on October 1, 1978. After the lineup Stone advised defendant of his constitutional rights, after which the defendant indicated that he wanted to talk. Defendant admitted that he had participated in the robbery, but stated that the girl arrested with him had not. He was surprised to learn that $21 dollars had been taken and said he had only gotten $6. He also stated that he had done some time with Gibson, and had visited him at the halfway house where he resided. Stone testified that the defendant was approximately five feet 10 inches tall, and that Gibson was approximately five feet 11 inches tall.

The parties entered into a stipulation that if Officer Gates were to testify, he would testify that on October 1, 1978, at approximately 12:45 a.m., he and his partner Officer Leman arrested Torrence Gibson at a Standard gas station located at LaSalle and North Avenue. Gibson was searched at that time and found to have on his person a wallet with an I.D. which Timothy Clarke identified at that time as being his, and $12.90. It was further stipulated that the two complainants would make the same identification in court if called upon to do so.

The defendant called Katherine Wolff, who testified that on October 1, 1978, she was defendant's girlfriend. She said that she and defendant were preparing to go out to eat when defendant received a phone call from Gibson who wanted to see him that evening. They told him where they were going to be and Gibson was there when they arrived. Gibson asked Wolff to light his cigarette, and Wolff refused. When defendant protested that he didn't think she should have to light his cigarette, Gibson cut defendant's finger with a knife, then he cut his own hand, saying, "See, I'm bleeding, too." The three of them left the restaurant, bought some liquor and went to the lake, where they drank and talked, with Gibson drinking most of the liquor, until Gibson said he wanted to stick somebody up. Defendant said he didn't want anything to do with it, and Gibson told him there would be more coming if he didn't, and showed defendant the knife. Gibson pointed out the victims and he and defendant walked over to them. She saw defendant standing behind the victims and heard Gibson's voice, but not his words. When Gibson and defendant walked away from the victims she walked with them to a gas station where defendant said he wanted to go home, and Gibson gave him some money for cab fare. Wolff went home with defendant. She and defendant were arrested the next day. She testified that defendant is five feet eight inches tall and weighs about 135 pounds, and that Gibson is about five feet nine or ten inches tall and weighs about 185 pounds. On cross-examination Wolff testified that Gibson did not have his knife out on the way to the liquor store or on the way to the lake, nor did he have the knife out when he stated that he wanted to rob somebody. He did have the knife out a few times at the lake when he was showing them he knew how

to throw a knife. She and defendant never attempted to leave the lakefront; they did not go to the police station on the way home from the gas station, nor did they call the police when they got home.

Angelo Stevenson testified that he was acquainted with the defendant for a year and a half, from 1974 into 1975, through his Jehovah's Witnesses Bible study work. He stated that defendant's reputation in the community for truth and veracity had always been a good one. On cross-examination he stated that he had had no contact with the defendant since 1975. He also stated that defendant's mother had told him that defendant had been convicted of robbery in 1974, and of possession of a stolen vehicle in 1978.

Torrence Gibson testified for the defendant that on October 1, 1978, he called defendant at home because he wanted to see him that evening, and told him he would meet him at the restaurant defendant was taking his woman (Katherine Wolff) to for dinner. At the restaurant Gibson and defendant got into an argument about whether Wolff had to light Gibson's cigarette, and defendant got in Gibson's way and got cut with a knife Gibson had with him. Gibson then cut his own hand to show it meant nothing personal. After dinner, Gibson, defendant and Wolff purchased liquor and pop and went to the lakefront. During this time Gibson had his knife in his pocket. At the lakefront Gibson drank most of the liquor and played with his knife by throwing it into the ground and into trees. After drinking the liquor Gibson felt like sticking somebody up; Wolff was against it, but defendant didn't have anything to say. Gibson testified that, "Wesley never wants to go with it. He hasn't got any guts. He's scared. He had to do what I say." Gibson picked out his victims and told defendant to come on, then Gibson stuck the people up while defendant stood there "looking stupid." Gibson grabbed one of the victims and put a knife to his throat, then he went through the victim's pockets. After the robbery Gibson, defendant and Wolff walked to a gas station on LaSalle where Gibson gave defendant some money to go home.

Defendant testified that he first met Torrence Gibson in Cook County Jail where Gibson looked out for him. He stated that he is five feet eight inches tall and weighs about 135 or 140 pounds, and that Gibson is six feet two inches tall and weighs about 180 pounds. Defendant said that Gibson never had to strike anyone in jail, he just told them what he was going to do and they would shut up. Defendant considered Gibson to be a strong, hard-nosed type person, and he was afraid of him. He stated that Gibson called him on October 1, 1978, and asked him what he was doing that evening. He told Gibson he was taking his girlfriend, Katherine Wolff, to a Yankee Doodle restaurant at Diversey and Clark. When he and Wolff arrived at the restaurant Gibson was already there. Gibson asked Wolff to light his cigarette, defendant told her not to do it, and the next

thing he knew Gibson had a knife out and had cut defendant's finger. Defendant stated that, "As a natural response [to being cut] I jumped off my feet, and at that time I was walking on a cane, and if I had to, I may have used it, but I doubt it." Gibson told him the cut was nothing, and started cutting himself. After dinner defendant, Wolff, and Gibson bought a pint of liquor, two quarts of beer and some pop at a tavern and walked to the lakefront. At the lake defendant drank about four sips of the liquor, Wolff drank mostly beer, and Gibson drank some of everything. Gibson then decided to pull a stickup. Defendant said he didn't want anything to do with it, but Gibson told him he had no choice, and he took his knife out of his vest pocket and put it in his front pocket. As they walked Gibson played with the knife by sticking it in the ground and throwing it at trees. When Gibson saw a couple of victims he told defendant to come on, and when defendant protested Gibson told him, "Your finger could have just as easily been your throat." He stated that he did not leave because he was afraid to. Gibson told him to hold the victims and threaten them with drowning in the water. While Gibson robbed each victim at knifepoint, defendant held the other one and told him to look into the water and not to turn around. After the robbery, he and Gibson ran part way up the lawn, then started to walk. As they walked they were aware that the victims were following them in a station wagon, and defendant told Gibson, "I told you it was stupid; we shouldn't have done it." When they got to a gas station Gibson went inside to make a phone call, and defendant waited outside with Wolff. When Gibson came out he gave defendant $6 for cab fare home. On October 2, 1978, defendant was arrested by Investigator Stone. After the lineup defendant called Stone down to make a statement. Defendant told Stone, "we did it." On cross-examination defendant admitted that he had visited Gibson at the work release center where he resided on three or four occasions. He said that when he gave a statement to Stone he never told him Gibson had forced him to commit the robbery, nor did he go to the police station or contact the police in any way after he left the gas station.

■■ Initially, defendant contends that the State failed to prove him guilty of armed robbery because the State did not disprove beyond a reasonable doubt his affirmative defense of compulsion, raised by him at trial when he maintained that he was compelled to participate in the armed robbery by Torrence Gibson under fear of death or great bodily harm. (Ill. Rev. Stat. 1977, ch. 38, pars. 7—11, 7—14, and 3—2.) He urges that the State failed to sustain its burden of proof with regard to this defense, and relies on his own testimony in support of his position. (*People v. Creach* (1979), 69 Ill. App. 3d 874, 387 N.E.2d 762; *People v. Graham* (1971), 2 Ill. App. 3d 1022, 279 N.E.2d 41.) The defendant claims that the proof established that he was in fear of death or great bodily harm from Torrence Gibson

because he was shorter and lighter in weight than Gibson, because Gibson had been his protector in County Jail where he had assessed Gibson to be a hard-nosed type, and particularly because a few hours prior to the robbery Gibson had cut defendant's finger with a knife at a restaurant when defendant protested that his girlfriend Katherine Wolff did not have to light Gibson's cigarette. He also relies on the behavior of Gibson at the lakefront immediately prior to the robbery when Gibson demonstrated his prowess with his knife by throwing it into trees and into the ground. Defendant contends that when Gibson announced that he wanted to rob somebody he made it clear that defendant had no choice and that "his finger could just as easily have been his throat." Defendant claims also that the testimony of the two complainants that he did not have a weapon during the robbery and did not attempt to strike either of them, but merely placed his hands on each victim's shoulders and told each one to look at the water, while Gibson held a knife to each victim and took his money further supports his contention. Finally, defendant claims that the testimony of Gibson and Wolff substantiated his testimony.

The State urges that the testimony regarding defendant's defense of compulsion was not credible and that the proof established the guilt of the defendant beyond a reasonable doubt. (*People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150; *People v. Nurse* (1975), 34 Ill. App. 3d 42, 339 N.E.2d 328.) The State claims that since the compulsion statute applies only where the defendant is threatened with the imminent infliction of death or great bodily harm, the defense is not credible in the instant case because the record supports the State's position that the defendant was not actually threatened with the imminent infliction of death or great bodily harm. (*People v. Ricker* (1970), 45 Ill. 2d 562, 262 N.E.2d 456; *People v. Gray*; Ill. Rev. Stat. 1977, ch. 38, par. 7—11.) In support of its position the State refers to the testimony of the two complainants that they were held by the defendant while a co-defendant robbed them at knifepoint, and to the testimony of Gibson and Wolff, neither of whom testified that defendant was directly threatened with violence if he did not participate in the robbery; rather, Gibson testified that defendant had to do what he told him to do because defendant "didn't have any guts." At no time did Gibson corroborate the testimony of defendant that his "finger could have just as easily been his throat." The State further contends that the relationship between Gibson and the defendant was not characteristic of the relationship one would have with an individual he feared. The testimony elicited at trial was that defendant had visited Gibson at the work release center where he resided three or four times before the date of the robbery; defendant and Gibson arranged to meet at the Yankee Doodle restaurant the day of the robbery; after defendant was

cut by Gibson he voluntarily remained at the restaurant with him, then left the restaurant in company with Gibson to buy liquor and go drink the same with him at the lakefront; nor did defendant make an attempt to leave Gibson after Gibson announced that he wanted to rob somebody. Furthermore, after the robbery, when defendant parted company with Gibson he made no attempt to contact the police, but rather attempted to flee from the police by running out the back door of his home when the police came to his house on October 2, 1978. The State contends that flight from the police is a factor to be considered by the trier of fact in arriving at a determination of guilt. (*People v. Lofton* (1977), 49 Ill. App. 3d 559, 364 N.E.2d 584.) Finally, the State claims that when defendant gave a voluntary statement to Investigator Stone he told Stone that "we did it." At that interview defendant expressed surprise that $21 had been taken, and indicated that his cut had only been $6. He never stated that Gibson had forced him to participate in the robbery. The State urges that the issue of compulsion is a question of fact which in a bench trial must be resolved by the trial judge whose function it is to determine the credibility of the witnesses and the weight to be given their testimony, and in the instant case the trial court properly found that the State had sustained its burden of proof. *People v. Coogler* (1975), 35 Ill. App. 3d 176, 340 N.E.2d 623.

We are not persuaded by the arguments of the defendant, and we agree with the State that the trial court could have found that the proof established beyond a reasonable doubt that defendant was not compelled to participate in the armed robbery under fear of death or great bodily harm, but rather was a willing participant, and was therefore guilty of the offense of armed robbery. *People v. Gray*; *People v. Creach*; *People v. Coogler*; *People v. Nurse*; and *People v. Graham*.

■■ Secondly, defendant contends that his Federal and State constitutional right to avoid self-incrimination was violated when the prosecution improperly elicited on cross-examination and commented during closing argument on defendant's post-arrest silence. During cross-examination concerning defendant's voluntary in-custody statement to Officer Stone, the prosecutor asked defendant if he had told Stone or anyone other than his lawyer until the trial that Gibson had forced him to participate in the armed robbery, and defendant admitted that he had not. The prosecutor commented on this testimony during his closing argument. Although defense counsel did not object at either point, defendant urges that this line of questioning and related comment constituted a violation of the rule set forth in *Doyle v. Ohio*, that the use for impeachment purposes of defendant's silence at the time of arrest and after receiving *Miranda* warnings violates the due process clause of the fourteenth amendment

because post-arrest silence following such warnings is insolubly ambiguous. *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

The State urges that defendant waived the issue of whether his rights under *Doyle* were violated since he did not object to either the State's cross-examination or closing argument regarding his post-arrest statement. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739; *People v. Lewis* (1977), 51 Ill. App. 3d 109, 366 N.E.2d 446.) The State also urges that regardless of whether the issue has been waived, no *Doyle* violation occurred in the instant case because the State did not impermissibly comment on defendant's post-arrest silence, but rather commented on the inconsistency between his post-arrest statements and his trial testimony. The State cites *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, wherein the United States Supreme Court made a distinction between questioning defendant regarding post-arrest silence and questioning defendant regarding post-arrest voluntary statements. The court stated that:

> "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182.)

The State maintains that the defendant, having chosen not to remain silent after receiving *Miranda* warnings, was properly impeached when the prosecutor questioned him concerning the inconsistency between his post-arrest statement to Investigator Stone and his in-court testimony at trial. (*Anderson v. Charles*; *People v. Rehbein* (1978), 74 Ill. 2d 435, 386 N.E.2d 39; *People v. Trumbull* (1978), 67 Ill. App. 3d 262, 384 N.E.2d 842.) Finally, the State urges that if the State did err in commenting on defendant's post-arrest silence the error was harmless beyond a reasonable doubt because proof of defendant's guilt was overwhelming (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857); and because the law in Illinois is well-settled that when the trial judge is the trier of fact, every presumption will be accorded that he considered only admissible evidence and disregarded inadmissible evidence in reaching his conclusion. *People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866.

We agree with the State that in the instant case the defendant did not remain silent after receiving *Miranda* warnings, but instead waived his

*Miranda* rights and gave a statement to Investigator Stone confessing his participation in the offense. From the record it appears that the trial court could have found that the prosecutor's questions were a permissible attempt to impeach defendant on cross-examination on the basis of the inconsistency between his post-arrest statement that he committed the robbery and got $6 from the co-defendant and his in-court testimony that he was compelled by the co-defendant to participate in the offense. *Anderson v. Charles; People v. Trumbull; People v. Henson* (1978), 58 Ill. App. 3d 42, 373 N.E.2d 852.

■■ Finally, defendant contends that he was denied his constitutional right to present a defense when on redirect examination he was not permitted to testify as to why he had not contacted the police after the robbery. Defendant claims that *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, and *Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920, stand for the proposition that he was constitutionally entitled to have his testimony considered explaining his silence after the robbery. The State argues that the trial court did not abuse its discretion in limiting the defendant's redirect examination testimony to the scope of the State's cross-examination. (*People v. Howell* (1977), 53 Ill. App. 3d 465, 368 N.E.2d 689.) The State distinguishes *Chambers* and *Washington* from the instant case. Unlike the case at bar, in *Chambers* three people who had heard another person confess to the commission of the murder for which defendant was tried were not permitted to testify because of Mississippi's hearsay rule, and the defendant was not permitted to cross-examine the alleged confessor because of the Mississippi voucher rule. Thus crucial evidence going directly to the question of Chambers' guilt or innocence was excluded. While in *Washington* a co-defendant was prohibited from testifying that he and not the defendant had shot and killed the victim on the basis of two Texas statutes which provided at the time of the trial that persons charged or convicted as co-participants in the same crime could not testify for one another, although they could testify for the State. The Supreme Court held that Washington was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to call a witness who was capable of testifying to events that he had personally observed and whose testimony would have been relevant and material to the defense.

In the instant case the defendant sought on redirect examination to introduce evidence concerning a phone call from Gibson after defendant arrived home from the robbery, and the State urges that not only did the State not cross-examine defendant in regard to anything that happened between him and Gibson after he arrived home, but that such a phone conversation was irrelevant with respect to whether defendant was in fear

of death or great bodily harm from Gibson during the robbery. The State argues that the defendant fully developed his theory of compulsion during his case in chief when both Gibson and Wolff testified extensively in his behalf.

We agree with the State that *Chambers* and *Washington* do not support the contentions of the defendant that he was denied the right to present a defense, and we further agree with the State that the record does not indicate that the trial court abused its discretion when it limited the scope of defendant's redirect examination to the scope of the State's cross-examination.

For the foregoing reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

GOLDBERG and McGLOON, JJ., concur.